[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-13681

_____

D.C. Docket No. 1:17-cr-00315-LMM-JKL-1

UNITED STATES OF AMERICA,

                                                    Plaintiff - Appellee,

versus

DONTIEZ PENDERGRASS,

                                                    Defendant - Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(April 22, 2021)

Before ROSENBAUM, LUCK, and ANDERSON, Circuit Judges.

ROSENBAUM, Circuit Judge:

    We vacate our opinion dated March 24, 2021, ___ F.3d ___, 2021 WL

1115426 (Mar. 24, 2021), in this case and replace it with this one.  Concealing one's

identity can literally be an art in itself.  Banksy, an English street artist known for his distinctive stenciling graffiti found along buildings in London, New Orleans, and San Francisco,[1] has long hidden his true identity and name.  But new Banksy works can often be identified by comparing them with patterns in his prior works:  his signature techniques,[2] his choice of medium—inconspicuous walls and a bag of spray paint cans, and his unique aesthetic—black-and-white stenciled images often accompanied by a vibrant pop of color.[3]  And perhaps the biggest clues are his satirical, thought-provoking messages underlying each piece.

Identifying patterns and whittling down a list of suspects are not just for Banksy sleuths.  Law enforcement used similar strategies to track down and identify a suspect in a string of five robberies targeting small, mom-and-pop businesses in the Atlanta suburb of Gwinnett County.  Distinctive hallmarks—like the robber's left-handed use of a black-and-silver pistol, bullets or their casings cycled through the same .40-caliber pistol in three of the five robberies, and clothing and accessories with unique designs—that made appearances in the robberies led investigators to

---

[1] Valerie Stimac, *Banksy in America: Where to See the Subversive Graffiti Artist's Work.* Lonely Planet, (Oct. 29, 2019), www.lonelyplanet.com/articles/where-to-see-banksy-usa (last visited Mar. 23, 2021).

[2] Simon Hattenstone, *The Importance of Spotting a Genuine Banksy*, The Guardian, (Mar. 14, 2007), https://www.theguardian.com/artanddesign/2007/mar/14/art.simonhattenstone (last visited Mar. 23, 2021).

[3] https://www.the-artists.org/Banksy/#:~:text=The%20stenciled%20technique%20of%20 Banksy%20is%20what%20makes,that%20he%20uses%20a%20computer%20make%20the%20 stencils (last visited Mar. 23, 2021); *see also* https://www.streetartbio.com/artists/banksy/ (last visited Mar. 23, 2011).

2

Dontiez Pendergrass.  Pendergrass was indicted on five counts of armed robbery and, relatedly, carrying a firearm in furtherance of the charged robberies.  Following a five-day trial, the jury convicted him on all charges.

Pendergrass now challenges his convictions on several grounds.  After careful consideration and with the benefit of oral argument, we affirm.

## I. Facts

We take the facts from the evidence presented at Pendergrass's trial.  In particular, we review the relevant evidence concerning the robberies of each of the five businesses:  the China Star restaurant, Polo's Taqueria, Discount Grocery, Bonita Coin Laundry, and the Best Wings restaurant.  Then we summarize the relevant evidence law enforcement recovered when it conducted a search warrant on Pendergrass's residence after the robberies had occurred.

A.     China Star Robbery

On the evening of November 19, 2016, the China Star Restaurant was robbed. The owner was in the back of the restaurant preparing for closing.  An armed man with his face covered from the nose down approached, pushed one of the restaurant employees inside, and demanded money.  As the robber used his left hand to aim a black-and-silver pistol at the owner, the owner handed over cash.

Restaurant surveillance captured the incident on video, and the jury viewed that footage during the trial.  The video revealed that the robber wore a red hooded

shirt under a long-sleeved black shirt with a distinctive white pattern on it.

B.    Polo's Taqueria Robbery

About a month after the China Star robbery, on December 24, 2016, three armed men robbed Polo's Taqueria shortly after it closed. Israel Morales, a Taqueria employee, sat outside the restaurant after his shift ended (at around midnight), when three men with faces covered from the nose down and covered bodies approached him. Two of the three men carried pistols, and the third had a long gun. The long gun was a chrome-barreled rifle with a scope on it. One of the assailants shot out the glass in the front door of the restaurant to gain entry. Then robbers forced Morales inside the restaurant and demanded he open the safe located in the office, but Morales told them he did not know how.

The owner of the restaurant, Gerardo Muro, was also present during the robbery and saw the three men approach as Morales sat out front. As this occurred, Muro ran to the back of the restaurant and heard a gunshot, so he called 911.

Surveillance cameras again recorded the robbery, and the jury viewed the resulting video and still photos from them. One of the robbers was a tall man who carried a black-and-silver pistol in his left hand. He wore gloves, along with a red shirt underneath a long-sleeved black shirt with a distinctive white pattern. And over his clothing, he wore a single-strap cross-body backpack.

Besides this, the government presented the testimony of FBI Special Agent

4

Mathew Carman, who discussed phone-related data he had collected. Carman testified that at 10:38 p.m. and 12:35 p.m. on the night of the robbery, a phone number ending in 1011, which was registered to Pendergrass, "pinged" off a cell tower that covered the area where Polo's Taqueria was located. He also attested to Google geo-location data that revealed Pendergrass's phone was near Polo's Taqueria about an hour before the robbery.

Ballistics expert Zachary Weitzel also testified. He noted the police had recovered an intact bullet cartridge from inside the restaurant near the front windows and identified it as ammunition for a Smith and Wesson .40-caliber gun. He also testified, based on his review of the evidence, that the ammunition had been cycled through the same firearm as the one used at the Discount Grocery and Best Wings robberies we describe below.[4]

C.    Discount Grocery Robbery

One week after the Polo's Taqueria robbery, on the evening of January 1, 2017, Discount Grocery was robbed. Discount Grocery is in the same shopping plaza as the China Star restaurant. Owner Sunil Joseph was closing the store between 9:00 and 9:30 p.m. and as he stood behind the counter, three men rushed at

---

[4] According to Weitzel, cycling marks are "marks that were imparted on the cartridge from it going through the gun and then being ejected without being fired." He said the shell casings from the Discount Grocery and Best Wings robberies also had specific cycling marks comparable to those on the Polo's Taqueria cartridge.

him. Their faces were covered from the nose down, and all three were armed with guns. One of the robbers grabbed Joseph and demanded he get on his knees. When Joseph refused, the robber pistol whipped him to force him to comply. While Joseph was on his knees, he reached for a gun located near the register. Another taller robber, who was wearing white gloves and was armed with a black-and-silver pistol in his left hand, answered by shooting Joseph three times. As Joseph bled, he called 911, while the robbers ran.

Joseph provided surveillance video to the police, and the government presented this video and still photos derived from it to the jury during the trial. The surveillance video showed that Joseph's assailant was a man who wore a single-strap cross-body backpack. Joseph further described the man who shot him as tall with "dreads" and said the man wore a red headwrap.

During their investigation of the scene, officers found droplets of blood outside the counter and several shell casings from when Joseph was shot. Forensic DNA expert Jeremy Fletcher testified that the blood found on the floor at Discount Grocery matched Pendergrass's blood. In fact, he attested that the DNA on the floor of the grocery store was 690 septillion times more likely to be Pendergrass's than an unknown person's.

As for the three shell casings recovered from the floor of the grocery store, as we have mentioned, Weitzel (the ballistics expert) confirmed that they were cycled

6

through the same Smith and Wesson .40-caliber gun used in the Polo's Taqueria robbery and in the Best Wings robbery we describe below. And similar to the Polo's Taqueria robbery, Agent Carman testified that, at 7:20 p.m. and 8:41 p.m. on the night of the robbery, Pendergrass's cell phone "pinged" off a cell tower that covered the area where Discount Grocery was located. Carman also presented Google geo-location data showing that Pendergrass's phone was near Discount Grocery about twenty minutes before the robbery and shooting.

D.    Bonita Coin Laundry Robbery

Four days after the Discount Grocery robbery, on January 4, 2017, the Bonita Coin Laundry was robbed. An employee of the laundry, Sonia Prudencio, was there when it happened, as were several patrons and some young children. According to Prudencio, the robbery occurred at around 9:00 p.m., when two armed men who were covered up rushed into the laundromat and grabbed her fourteen-year-old daughter. After commanding the other customers to get on the floor, the men took Prudencio's daughter to the safe and stole cash.

Surveillance video the store manager provided and the government played for the jury showed a taller robber. He was wearing a red hooded shirt, white gloves, and a covering on his face. In his left hand, he held a black-and-silver pistol.

7

Other witnesses who were threatened during the robbery also testified. The witnesses all said that the robbers made everyone go to the restroom, where the robbers blocked them in with a pool table so the robbers could escape.

E.    Best Wings Robbery

Eleven days after the Discount Laundry robbery, on January 15, 2017, Best Wings was robbed. The robbery occurred between 3:00 and 4:00 a.m., after Best Wings had closed.

As Saurilius Kyzelius, a Best Wings patron, and Brittany Anderson, a Best Wings employee, left the restaurant and approached Anderson's car, two armed robbers accosted them, one with a gun in his left hand. The robbers insisted that the two return to the restaurant and demanded the key to the safe.

Another customer heard a commotion and went outside to see what was happening. He struggled with the taller robber, who wore a red shirt and white gloves, and carried a pistol in his left hand. During this struggle, the taller robber fired a shot towards Anderson's car, where Anderson and Kyzelius were attempting to evade the other robber. The shot barely missed Kyzelius. Then the robbers forced everyone back inside the restaurant and forced them to get on their knees. The robbers again demanded that Anderson give them the key to the safe. When she said she did not have it, the robbers took Kyzelius's wallet and cash. As another car pulled up to the restaurant, the robbers fled on foot, crossed the street, and jumped a

8

fence into a residential area near Wenham Lane—where Pendergrass was later discovered to reside. All of this was captured on surveillance video, which the government played for the jury.

Responding officers found the shell casing fired towards Anderson's car and noted what appeared to be a bullet hole in her car. Weitzel testified that the shell casing was cycled through the same Smith and Wesson .40-caliber gun used at the Discount Laundry robbery.

And as with some of the other robberies, Agent Carman testified that Pendergrass's cellphone was located near Best Wings shortly after the robbery. Specifically, the phone ending in 1011 "pinged" off the cell towers near Best Wings at various times between 3:35 and 3:58 a.m. Google geo-location data showed Pendergrass's presence within 70 meters of Best Wings just before the robbery. And within minutes after it, the phone was back near Pendergrass's residence at 1044 Wenham Lane.

F.    Evidence Recovered During Search of Pendergrass's Home

On March 30, 2017, law enforcement executed a search warrant at Pendergrass's home and for his car parked outside. In the basement of the house, officers recovered a black single-strap cross-body backpack like the one seen in the Discount Grocery and Polo's Taqueria robbery videos. They also seized a black long-sleeved shirt with a distinctive white pattern on it that looked like the robber

9

wore during the Polo's Taqueria and China Star robberies.

Inside Pendergrass's car, officers found a rifle with a distinctive chrome barrel and scope, like the one used by one of the robbers at Polo's Taqueria.[5] Pendergrass admitted that the shirt and rifle were his and conceded that he was left-handed.

## II.  Procedural Background

### A.    The Indictment

Pendergrass was indicted on five counts of Hobbs Act armed robbery, in violation of 18 U.S.C. § 1951, and five counts of brandishing or discharging a firearm during, and in relation to, a crime of violence, in violation of 18 U.S.C. § 924(c).  The federal public defender was appointed to represent Pendergrass.

### B.    Motion to Suppress Phone

During the proceedings, Pendergrass filed a motion to suppress certain evidence.  Below, we discuss the facts relating to that motion.

On March 10, 2017—after the robberies but unrelated to them—officers responded to a 911 call.  They found Pendergrass, who had been shot, with a gold Porsche Cayenne about 200 feet away.  Law enforcement impounded the car and obtained a warrant to search it for "handguns, long guns, drugs, bullets, blood and/or DNA."  Among other things, the search yielded a gold LG phone belonging

---

[5] The search of Pendergrass's car on March 30, 2017, was the second search of the vehicle. As we discuss in Section II.B., *infra*, law enforcement first searched his car on March 10, 2017. At that time, officers seized an LG cell phone.

to Pendergrass. An inspection of the phone revealed pictures and videos that incriminated Pendergrass in the robberies.

Before trial, Pendergrass filed a motion to suppress the evidence from the phone. He argued that the search of the phone was unlawful because it exceeded the scope of the search warrant, which authorized a search of the car for only "handguns, long guns, drugs, bullets, blood or DNA." A magistrate judge held a hearing on the motion and ultimately recommended granting the motion to suppress, finding that the detective lacked probable cause to believe that the phone contained evidence of the shooting of Pendergrass. The district court adopted the magistrate judge's recommendation and granted the motion to suppress the LG phone and its contents.

C.    Motion to Exclude Google Geo-Location Data

Prior to Pendergrass's indictment, and to shore up the case against him, FBI Special Agent Matthew Winn submitted an application for a search warrant to obtain "data associated with Google account Dontiezpendergrass@gmail.com" including Global Positioning System ("GPS") data and other location data. On July 24, 2017, a judge issued the search warrant, directing Google to provide the government with the geo-location information associated with the Google account. Google complied.

Before trial, Pendergrass filed a motion to exclude, among other things, the Google geo-location data showing Pendergrass's whereabouts during the robberies.

In support of the motion, Pendergrass asserted that the search-warrant application improperly relied on evidence gathered from the illegally obtained LG phone, including the fact that the Google username dontiezpendergrass@gmail.com was linked to the LG cellphone. Pendergrass argued that the Google geo-location data should all be excluded as fruit of the poisonous tree because it stemmed from the unlawful search of the LG phone, and the evidence obtained from the phone had since been suppressed.

The government opposed the motion, insisting it had an independent source of information for Pendergrass's email address, and it would have inevitably discovered Pendergrass's email address and obtained the resulting geo-location data from Google, regardless.

The district court denied Pendergrass's motion because it concluded that the government had shown "a reasonable probability that the evidence in question would have been discovered other than by the tainted source." It also relied on the government's representation that it would have sought out the geo-location data based on the email address associated with the Instagram account. As a result, the government admitted the Google geo-location data at trial.

D.    Motion to Continue Trial

On January 23, 2019, the district court granted a motion for continuance and rescheduled the trial for June 17, 2019. A few days later, on January 28, 2019,

Pendergrass moved to appoint new counsel. On February 4, 2019, noting that Pendergrass was not financially able to employ counsel, the court granted the motion and entered an order appointing new counsel.

On June 3, 3019, with only two weeks left until the start of trial, Pendergrass's attorney filed a motion to continue the trial. In the motion, counsel recounted that she had recently received a K-9 report from the government. She believed that the government intended to offer expert testimony at trial about whether the K-9 "alerted" near Pendergrass's home. Counsel also mentioned photographs she expected to be forthcoming and said the recordings of the 911 calls from the robberies had recently been provided. Citing the need for an "opportunity to properly investigate and prepare for the K-9 expert," counsel moved for a continuance of the trial. She was careful to explain that "the other late-produced items would not keep the defense from being ready on June 17, 2019."

At the pretrial conference on June 11, 2019, the district court heard oral argument about the motion to continue and about whether the K-9 evidence was admissible. The district court decided to exclude the K-9 evidence under Federal Rule of Evidence 403. And since the K-9 evidence was no longer an issue, the district court denied the motion to continue the trial.

E.    Jury Trial

13

As scheduled, the jury trial began on June 17, 2019. During voir dire, prospective Juror 20 stated that she worked as a Coordinating Chief Community Supervision Officer for the Department of Community Supervision. When asked whether she was a probation officer, Juror 20 said, "Well, Community Supervision Officer, Probation and Parole, Yes, Ma'am." She also verified that she was POST certified.[6] Juror 20 agreed that, if she were selected as a juror, her job (and her POST certification and employment in law enforcement) would not affect her ability to judge the trial testimony fairly and impartially. Juror 20 also said she would not give more weight to any law-enforcement witness simply because of her job.

When the district court asked if Pendergrass wished to strike any juror for cause, Pendergrass argued that the court should strike Juror 20 as statutorily exempt because she was a POST-certified law-enforcement officer. The district court disagreed. It concluded Juror 20 was not exempt from jury service because she was not a member of a police or fire department, as that term is understood in the exemption from jury service for "members of the fire or police departments," as set forth in 28 U.S.C. § 1863(b)(6).[7] The district court also noted the jury office's policy in conducting its pre-screening process did not consider probation officers as exempt

---

[6] A POST-certified person has received education in Peace Officer Standards and Training.

[7] The district court determined that Juror 20 was not exempt under § 1863(c), either, because she was not a public officer in the executive branch of the United States government or of any state.

14

under § 1863. Because neither party struck her using a peremptory challenge, Juror 20 served as a member of the jury.

During trial, the government presented the testimony of twenty-seven witnesses, including the robbery victims and the law-enforcement personnel who responded to the robberies, processed the crime scenes, and conducted forensic examinations of the evidence. As we have mentioned, the government also showed the jury surveillance videos and still photos derived from them. A ballistics expert testified regarding shell casings and cartridges found at three of the robbery scenes, and the government presented the jury with cell-site and Google geo-location data placing Pendergrass in the area of three of the robberies. Finally, the government entered into evidence the items discovered during a search of Pendergrass's home and car.

Of particular relevance to this appeal is the testimony of Special Agent Winn. Winn testified that his investigation into the armed robberies began in early 2017, when he obtained cell phone "tower dumps." These tower dumps provided him with all the phone numbers that had accessed the closest cell towers to the robbery locations around the times of the robberies. From the tower-dump results, Winn identified two phone numbers that were near three of the robbery locations around the time of the robberies. One of the phone numbers belonged to Pendergrass. Law

enforcement ruled out the other because it belonged to someone who did not meet the physical description of the robbers, based on surveillance video.

Next, Winn spoke about another potential suspect law enforcement had eliminated from consideration—Quintarious Luke. Law enforcement originally identified Luke after a traffic stop because he had a black-and-silver pistol. But Luke's physical appearance differed from those of the robbers and his phone records placed him a significant distance from the robbery locations when the robberies took place. Winn also testified that the Georgia Bureau of Investigation ("GBI") analyzed Luke's gun, and ballistics analysis confirmed that it was not the same pistol used in the Polo's Taqueria, Discount Grocery, and Best Wings robberies.

Then the government turned to the video footage it was able to obtain. It showed Winn screenshots from the admitted surveillance videos and asked him to point out to the jury things he found to be significant, such as items a robber was wearing. Pendergrass complains that Winn repeatedly stated that he had watched the videos of the robberies many times and implied that the jury should therefore believe his description of the video and screenshots.

Before beginning her cross-examination, defense counsel sought for the district court to instruct the jury that it should disregard any of Winn's testimony that Pendergrass was the person depicted in the video of the robberies, and that the

16

question was a matter for the jury alone to decide. The district court obliged, instructing the jury as follows:

> [T]o the extent that you heard testimony from Special Agent Winn that in his opinion Mr. Pendergrass was the person depicted in the surveillance video of the robberies, you are to disregard it. Whether Mr. Pendergrass is the person depicted in the videos is a matter for you, the jury, to decide. And that is just an instruction I wanted to give you at this time so there wouldn't be any confusion.

At the conclusion of the trial, the jury found Pendergrass guilty of all charged offenses, and the district court sentenced Pendergrass to a total of 552 months' imprisonment. Pendergrass now appeals.

## III.

Pendergrass raises six challenges to his conviction. He contends that he was prejudiced by the district court's denial of his motion to continue trial; he asserts that the district court improperly declined to dismiss Juror 20 for cause; he takes issue with certain testimony Winn gave; he argues that admission of the geo-location data violated his Fourth Amendment rights; he contests the sufficiency of the evidence; and finally, he urges us to find cumulative error stemming from any combination of these alleged errors. We consider each claim in turn.

A.   The district court did not abuse its discretion when it denied Pendergrass's motion to continue the trial date.

Pendergrass argues that the denial of his motion to continue the trial date essentially rendered meaningless his fundamental right to assistance of counsel

17

under the Sixth Amendment.  In Pendergrass's view, counsel lacked sufficient time to prepare for trial.  In support of this contention, Pendergrass notes that trial counsel had been appointed only a few months prior to trial.  He also complains that he was not able to review all his discovery, so he did not fully realize the evidence against him.

We are not persuaded.  Trial courts are afforded "great latitude" with respect to scheduling, and judges enjoy "broad discretion" in ruling on motions for continuances.  *United States v. Garmany,* 762 F.2d 929, 936 (11th Cir. 1985).  We review for abuse of discretion a district court's denial of a motion to continue trial, and the denial of such a request does not rise to error "unless it is arbitrary and unreasonable and severely prejudices the moving party." *SEC v. Levin*, 849 F.3d 995, 1001 (11th Cir. 2017); *see also United States v. Valladares*, 544 F.3d 1257, 1262 (11th Cir. 2008).

When a criminal defendant claims he did not have enough time to prepare for trial, he must identify the relevant evidence he would have presented had the request for a continuance been granted.  *United States v. Jeri*, 869 F.3d 1247, 1257 (11th Cir. 2017).  We also consider several factors, including the "time available for preparation, the likelihood of prejudice from denial, the accused's role in shortening the effective preparation time, the degree of complexity of the case, and the availability of discovery from the prosecution." *Id.* (quotation omitted).

18

Here, Pendergrass has not pointed to any evidence he would have presented if his request for a continuance had been granted. Plus, defense counsel stated she sought the continuance to obtain time to prepare for the K-9 evidence the government planned to introduce at trial. But the district court eliminated that problem when it excluded the K-9 evidence. And significantly, counsel conceded "the other late-produced items would not keep the defense from being ready on June 17, 2019."

True, during the pretrial conference, Pendergrass asserted for the first time that he had not been able to fully review the original discovery because he had inadequate access to library time at the jail. But the district court remedied this problem as well, directing that Pendergrass receive additional time to review his discovery.

Under the circumstances, the district court acted well within its discretion when it denied the motion for a continuance. Pendergrass had roughly two years to prepare for his trial and did not point to any evidence that would have been presented if the continuance had been granted. And although his trial counsel came into the case late in the game, that was because Pendergrass twice sought new counsel. Even so, his new counsel had about four months to prepare for trial, and she told the court that she would be ready in the absence of the K-9 evidence. The evidence presented at trial also was not voluminous or complicated. In sum, the district court acted well

19

within its discretion when it denied the motion to continue. *See Valladares*, 544 F.3d at 1262 (citing *United States v. Gibbs*, 594 F.2d 125, 127 (5th Cir. 1979) (district court did not abuse its discretion when finding the defendant had ample time to prepare his defense, and he had "point[ed] to no critical documents that might have been uncovered with additional time and whose absence prejudiced or impaired his defense.")).

B.      The district court did not err or abuse its discretion in declining to dismiss Juror 20 for cause.

Next, Pendergrass contends the district court erred by refusing to excuse Juror 20 from service under 28 U.S.C. § 1863(b)(6), because of her employment. We review for abuse of discretion a district court's decision to strike, or to refuse to strike, a prospective juror for cause. *United States v. Abraham*, 386 F.3d 1033, 1035 (11th Cir. 2004) (per curiam). But since this issue also raises a question of statutory interpretation, we review that matter de novo. *See United States v. St. Amour*, 886 F.3d 1009, 1013 (11th Cir. 2018) (per curiam).

Title 28 U.S.C. Section 1863 requires each district court to create a plan for random jury selection. Under the statute, certain persons must be exempted from jury service, based on their employment. As relevant here, § 1863 provides that "members of the fire or police departments of any State, the District of Columbia, any territory or possession of the United States, or any subdivision of a State, the District of Columbia, or such territory or possession" are "barred from jury service

20

on the ground that they are exempt." 28 U.S.C. § 1863(b)(6)(B). Pendergrass argues that Juror 20 fell within this exemption because she worked for the Department of Community Supervision.

Although Pendergrass acknowledges the statute does not define the phrase "members of . . . police departments," he relies on Georgia law to piece together support for his argument that Juror 20 falls into this category. We walk through Pendergrass's analysis.

He first notes that under Georgia law, a person must be POST certified to serve as a law-enforcement officer. Appellant's Brief at 37 (citing https://www.gapost.org/about.html). As we have noted, Juror 20 was POST certified.

Pendergrass also observes that although O.C.G.A. § 35-8-2(8)(A) does not refer to police officers, it defines a "peace officer" as someone who is "vested either expressly by law or by virtue of public employment or service with authority to enforce the criminal or traffic laws through the power of arrest and whose duties include the preservation of public order, the protection of life and property, and the prevention, detection, or investigation of crime." And he notes a person who is authorized to exercise the power of arrest and who is employed by the Department of Community Supervision—like Juror 20—is expressly designated as a "peace officer." *See* O.C.G.A. § 35-8-2(8)(C). Georgia law also defines a "[l]aw enforcement unit" to include the Department of Community Supervision. O.C.G.A.

21

§ 35-8-2(7)(C). Pendergrass further points out that, among other duties, the Department of Community Supervision supervises certain defendants and administers and enforces laws, rules, and regulations relating to probation and parole supervision. *See* O.C.G.A. § 42-3-3(a).

Putting all this together, Pendergrass asserts that these circumstances make the Department of Community Supervision a law-enforcement unit of the State of Georgia, the equivalent of a police department at the state level. He emphasizes that Juror 20 was POST certified and that she informed the court that she has testified against criminal defendants at trial, which Pendergrass characterizes as a "key function of police work." So Pendergrass contends Juror 20 was required under § 1863(b)(6)(B) to be exempted from service because she was a member of a police department.

In further support of his position, Pendergrass argues that construing § 1863(b)(6)(B) to exempt only employees of entities labeled as "police departments" would allow officers of a wide array of entities that are clearly encompassed by the purpose of the statute to serve as jurors. For instance, Pendergrass contends, sheriff's deputies, Georgia State Patrol officers, Georgia Bureau of Investigation agents, and others similar to them would all fall outside the district court's interpretation of § 1863(b)(6)(B).

We disagree. We begin "where courts should always begin the process of

22

legislative interpretation, and where they often should end it as well, which is with the words of the statutory provision." *Harris v. Garner*, 216 F.3d 970, 972 (11th Cir. 2000) (en banc). But when considering the plain language of the text, we bear in mind that "[a] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme." *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60 (2004) (quotation omitted). Where the language of the statute is not entirely clear, we also consider the canons of statutory construction. *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1225 (11th Cir. 2001).

Here, we need go no further than the plain language of the statute, which we find to be unambiguous. Significantly, § 1863(b)(6)(B) uses the term "members of . . . police departments"—not a broader catchall term like "members of law enforcement" or "individuals who are POST certified." True, the statute does not define "police department," but that term is fairly self-evident. *Black's Law Dictionary* defines "police department" as "[t]he official local law-enforcement organization in a particular town, city, or area" or, "[t]he building in which this organization has its headquarters or a satellite office." *Police Department*, Black's Law Dictionary (11th ed. 2019). The *Merriam-Webster Dictionary* defines "police department" as "a governmental department concerned with the administration of the police force." *Police Department*, Merriam-Webster Dictionary, https://www. merriam-webster.com/dictionary/police%20department (last accessed March 23,

23

2021).  In turn, "police force" means "a body of trained officers entrusted by a government with maintenance of public peace and order, enforcement of laws, and prevention and detection of crime."  *Police Force*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/police%20force    (last    accessed March 23, 2021).

Taking these definitions together, the plain language of the statute means that to be excluded from jury service under § 1863, a person must *in function* be a police officer, not a member of any organization that could fall under the broad umbrella of law enforcement.  We "are not at liberty to rewrite the statute passed by Congress and signed by the President."  *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 528 (2019).  Significantly, the Georgia statute that lists the duties assigned to Juror 20 omits quintessential functions of police officers, as that term is commonly understood:  the prevention and detection of crime and maintenance of peace and order.

We reject Pendergrass's argument that reading the statute in this way excludes police officers whose organizational names do not contain the term "police department."  The statute does not require the term to be incorporated into the organization's name;  it demands only that the individual be a "member" of what is functionally a police department.  Clearly, individuals who are sheriff's deputies or members of the Georgia State Patrol qualify as members of a police department

24

because of their work responsibilities. The duties individuals perform matter, not the titles of the agency to which they belong.

We have also observed that "allowing police officers to perform their duties without the interruption of jury service is good for the community." *United States v. Terry*, 60 F.3d 1541, 1544 (11th Cir. 1995). Indeed, the prevention and detection of crime and maintenance of peace and order are essential functions. And while DCS officers also perform important and significant duties such as supervising the state's probationers and parolees, as well as some juveniles, they do not regularly render the same types of bare-necessity services as police officers. *See* O.C.G.A. § 42-3-3. Unlike police officers, DCS officers do not respond to 911 calls, enforce criminal and traffic laws, patrol the streets, and make arrests on a daily basis outside those necessary to their supervisory duties.

Our conclusion aligns with that of the Tenth Circuit. It rejected a challenge similar to the one Pendergrass raises. *See United States v. McCullah*, 76 F.3d 1087, 1099 (10th Cir. 1996). There, McCullah contended that the prospective juror, a prison guard at a state minimum-security prison, should have been stricken for cause under § 1863(b)(6)(B) because, in McCullah's view, the juror's job as a prison guard qualified him as a "member[] of . . . [a] police department[]." In support of his argument, McCullah relied on Oklahoma statutes that gave prison guards the powers of "peace officers" and that defined "police officer" and "peace officer" comparably.

*Id.* at 1099. The Tenth Circuit determined that McCullah's interpretation of § 1863(b)(6)(B) was inconsistent with the plain language of the statute, which clearly refers to only the narrow category of "police officers." *Id.* Although the Tenth Circuit recognized that prison guards had some police-like duties, it held that they were not members of the police department. *Id.* Had Congress intended to exclude a broader class of law-enforcement employees from jury service, the court reasoned, it would have simply used a broader term such as "law enforcement officer." *Id.*

We agree. Juror 20 did not qualify as a "member[] of . . . [a] police department" under § 1863(b)(6)(B). And because Juror 20 stated that she would be fair and impartial in her assessment of the evidence and promised not to give more weight to any law-enforcement witness simply because of her job, the district court did not abuse its discretion in declining to reject Juror 20 for cause.

C.   <u>Even assuming without deciding that the Google geo-location data should have been excluded as "fruit of the poisonous tree," any error in admitting that evidence was harmless beyond a reasonable doubt.</u>

Pendergrass contends the admission of the Google geo-location data violated his Fourth Amendment rights because it constituted "fruit of the poisonous tree." The Fourth Amendment protects against unreasonable searches and seizures. When a court determines that a violation has occurred, under appropriate circumstances, it excludes evidence garnered as a result of the breach. *See Herring v. United States*, 555 U.S. 135, 139 (2009). This exclusionary rule extends beyond the direct results

26

of police misconduct to "evidence derived from the illegal conduct, or fruit of the poisonous tree." *United States v. Terzado-Madruga*, 897 F.2d 1099, 1112 (11th Cir. 1990) (quotation omitted).

Here, Pendergrass emphasizes the district court's suppression of the LG phone and its contents because of the phone's unlawful seizure. He claims the court also should have prohibited the Google geo-location data because law enforcement discovered Pendergrass's Gmail address on the excluded LG phone, and the Gmail address was the information that prompted the July 2017 search warrant to Google.

In Pendergrass's view, the government did not demonstrate the applicability of an exception to the exclusionary rule because it did not actively pursue leads that would have led to the Google geo-location data before the illegal seizure of the LG phone. *See United States v. Satterfield*, 743 F.2d 827, 846 (11th Cir. 1984). For that reason, Pendergrass argues the district court erred in concluding that the government established the inevitable-discovery exception to the fruit-of-the-poisonous-tree doctrine. He adds that the independent-source exception was not satisfied because the district court did not make a finding on subjective intent. *See United States v. Barron-Soto*, 820 F.3d 409, 414 (11th Cir. 2016).

We assume without deciding that the district court erred in allowing the admission of the Google geo-location data during trial because it amounted to fruit of the poisonous tree, and no exception applied. Nevertheless, Pendergrass is not

27

entitled to a vacatur of his conviction because any error was harmless in the shadow of the overwhelming evidence against Pendergrass with respect to the three robberies in which the government presented geo-location data.

The harmless-error rule applies to many constitutional errors, including violations of the Fourth Amendment. *See United States v. Roy*, 855 F.3d 1133, 1167-68 (11th Cir. 2017). A constitutional error is harmless "if the government proves beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *United States v. Pon*, 963 F.3d 1207, 1227 (11th Cir. 2020) (citation and internal quotation marks omitted). We have explained that that standard is satisfied if the error is "unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *Id.* (citation and internal quotation marks omitted). To assess this, we examine "the facts, the trial context of the error, and the prejudice created thereby as juxtaposed against the strength of the evidence of defendant's guilt." *United States v. Reed*, 700 F.2d 638, 646 (11th Cir. 1983) (citation and internal quotation marks omitted).

Here, the jury heard Google geo-location evidence for only three of the five robberies: Discount Grocery, Polo's Taqueria, and Best Wings. The weight of the evidence against Pendergrass relating individually to each of the Discount Grocery and Polo's Taqueria robberies was crushing. And as for the evidence supporting

28

Pendergrass's conviction on the Best Wings robbery, that evidence, too, was formidable, especially when we account for all the evidence in this case.

We begin by reviewing the evidence in the Discount Grocery robbery. For starters, Pendergrass's DNA was found at the scene. Indeed, an expert testified that, based on an analysis of the blood droplets recovered from the store's floor, the DNA found was 690 septillion times more likely to be Pendergrass's than that of an unknown person. Plus, cell-tower data showed Pendergrass in the vicinity of the robbery at the relevant time. Even without the Google geo-location data, then, these two pieces of evidence placed Pendergrass at the scene.

But that's not all. The three shell casings found on the floor of the grocery store showed they were cycled through the same Smith and Wesson .40-caliber gun used in the Polo's Taqueria and Best Wings robberies. And video surveillance and testimony established that a robber in all five crimes was a tall, left-handed man, who brandished a black-and-silver pistol and covered his face from the nose down. It also showed that the Discount Groceries robber wore a single-strap cross-body backpack and white gloves. Pendergrass admitted he was left-handed, and from Pendergrass's residence, law enforcement recovered a backpack like the one in the video. As for the white gloves, they made an appearance on the left-handed robber in the videos from three of the other robberies as well.

This avalanche of evidence easily establishes Pendergrass's guilt in the

29

Discount Grocery robbery beyond a reasonable doubt. We confidently conclude that the admission of the Google geo-location data had no substantial influence on the outcome of the trial.

Nor did the Google geo-location data have any more of a substantial influence on the jury's verdict as it pertained to the Polo's Taqueria robbery. First, cell-tower data placed Pendergrass's phone in the area at the time of the robbery. Second, as we have noted, a bullet cartridge found at the scene had been cycled through the same gun used during the Discount Grocery and Best Wing robberies. Third, like with the other robberies, the suspects covered their faces in the same way and carried guns. Fourth, a chrome-barreled long gun with a scope on it that was later found at Pendergrass's residence matched the description of the gun that one of the robbers carried, and Pendergrass admitted the long gun was his.

Fifth, as with the Discount Grocery robbery, video surveillance and testimony concerning the Polo's Taqueria robbery established that one of the robbers was a tall, left-handed man, who brandished a black-and-silver pistol. Sixth, video showed the robber wearing a single-strap crossbody backpack like the one recovered from Pendergrass's residence. Seventh, video also captured that robber wearing white gloves like the ones worn in three of the other robberies. And eighth, the robber wore a red shirt under a long-sleeved black shirt with a distinctive white pattern. As with the rifle and cross-body backpack, the black-and-white shirt was found at

30

Pendergrass's house, and he admitted it was his.

This sea of evidence against Pendergrass requires us to conclude beyond a reasonable doubt that the admission of the Google geo-location data had no substantial influence on the outcome of the trial. Any error in admitting the Google geo-location was therefore harmless.

Finally, we turn to the Best Wings robbery. But because Pendergrass challenges his conviction on that one on sufficiency-of-the-evidence grounds as well as on the admission of the Google geo-location data, we address it below. Nevertheless, we conclude that the geo-location data had no substantial effect on the verdict because, for the reasons we explain in Section III.D, the other evidence against Pendergrass was quite strong and because unchallenged cell-site data also placed Pendergrass in the vicinity of the robbery. In sum, we are satisfied beyond a reasonable doubt that any error in admitting the geo-location data was harmless, as the other evidence against Pendergrass handily established his guilt.

D.    The evidence sufficiently supported Pendergrass's convictions on all five robberies.

Pendergrass urges that the government failed to present sufficient evidence to sustain his convictions on the China Star, Bonita Coin Laundry, and Best Wings robberies. We disagree. Particularly when viewed together, the evidence of all the robberies establishes a modus operandi and a pattern that support Pendergrass's convictions for each robbery.

31

We review de novo the sufficiency of the evidence to support a conviction and the denial of a Rule 29, Fed. R. Crim. P., motion for judgment of acquittal. *United States v. Gamory*, 635 F.3d 480, 497 (11th Cir. 2011). In conducting our review, though, we consider all evidence in the light most favorable to the government and draw all reasonable inferences in favor of the jury's verdict. *United States v. Grzybowicz*, 747 F.3d 1296, 1304 (11th Cir. 2014). After applying these principles, we determine "whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt." *Gamory*, 635 F.3d at 497 (quotation omitted). Reasonable inferences, drawn from circumstantial evidence, are sufficient to support a guilty verdict. *See United States v. Martin*, 803 F.3d 581, 587-88 (11th Cir. 2015). Credibility questions are for the jury, and we assume the jury made all credibility determinations in support of the verdict. *United States v. Jiminez*, 564 F.3d 1280, 1285 (11th Cir. 2009).

We conclude this case falls squarely under our decision in *United States v. Bowers*, 811 F.3d 412 (11th Cir. 2016). There, like here, the government tried multiple robberies in a single case. *Id.* at 416-422. To support its case, the government presented modus operandi evidence, as well as physical evidence connecting some of the robberies. *Id.* The defendant challenged the sufficiency of the evidence, and we affirmed, holding that evidence of the modus operandi and

32

other recurring patterns among the eight robberies in that case permitted the jury to conclude that the same person committed all eight crimes. *Id.* at 424, 430.

Here, too, evidence of the modus operandi and other evidentiary patterns allowed the jury to find that Pendergrass executed all five robberies, including the three challenged as lacking sufficient evidence. A summary chart of the evidence (exclusive of the Google geo-location data) demonstrates the many similarities among the five robberies:

| Characteristic | China Star | Polo's Taqueria | Discount Grocery | Bonita Coin Laundry | Best Wings |
|---|---|---|---|---|---|
| Occurred at closing or later at night | X | X | X | X | X |
| Mom-and-Pop-type shop | X | X | X | X | X |
| Taller robber | X | X | X | X | X |
| Who was left-handed | X | X | X | X | X |
| Who brandished silver-and-black pistol | X | X | X | X | X |
| And who covered his face | X | X | X | X | X |
| And who wore a black shirt with a distinctive white design (like one recovered at Pendergrass's residence and which he admitted he owned) | X | X | | | |
| And wore red under- or outer-shirt layer | X | X | | X | X |
| And wore a single-strap, cross-body backpack (like one recovered at Pendergrass's residence) | | X | X | | |
| And wore white gloves | | X | X | X | X |
| Shot or shots fired | | X | X | | X |
| Casings or bullets recovered from Smith & Wesson .40-caliber gun | | X | X | | X |
| Casings recovered matched other casings recovered at other charged robberies | | X | X | | X |
| Cell-tower dump data showed phone associated with Pendergrass in the area | | X | X | | X |

33

| | | | | | |
|---|---|---|---|---|---|
| Rifle with distinctive chrome barrel and scope (like one recovered at Pendergrass's residence and which he admitted he owned), used by another robber | | X | | | |
| Pendergrass's DNA recovered from scene | | | X | | |

We conclude that a reasonable jury could (and did) find beyond a reasonable doubt that these patterns were not coincidence but rather evidence that the same person committed all five robberies. Similar modus operandi evidence demonstrated that all the businesses targeted were mom-and-pop establishments (with China Star and Discount Groceries even located in the same strip mall); the robberies all took place at the closing of the business or later; all five robberies were committed in a short period (a span of eight weeks); the robbers covered their faces and brandished guns in the same way in all the robberies; one robber carried a silver-and-black pistol in his left hand in all the robberies; in four of the five robberies, that same robber wore a red shirt as either an under or outer layer; and in four of the five robberies, that same robber wore white gloves.

Plus, Pendergrass was firmly linked to the string of robberies in significant ways: his DNA was found at one scene; cell-tower evidence connected Pendergrass with three of the crimes; at Pendergrass's residence, law enforcement found a black shirt with a distinctive white pattern like the piece of clothing a robber wore in both the China Star and Polo's Taqueria robberies, and Pendergrass admitted the item was his. Law enforcement also recovered a bullet or its casings from the Best Wings

34

scene that matched those found at the sites of Polo's Taqueria and Discount Grocery (where Pendergrass's DNA was recovered) and was cycled through the same gun used at all three locations.

When modus operandi evidence supports an inference that the same person committed multiple crimes, a jury can consider identity evidence from other robberies. *See Bowers*, 811 F.3d at 429. Here, even without accounting for other evidence that may pertain to the three robberies for which Pendergrass challenges his convictions, through repeating patterns in all five robberies, the overwhelming evidence that Pendergrass committed at least two of the other robberies (Discount Grocery and Polo's Taqueria) permits the inference that he committed the three challenged robberies as well. And that is especially the case in the Best Wings robbery, where, as we have noted, law enforcement recovered a bullet casing that was cycled through the same gun the robber used at Discount Grocery and Polo's Taqueria. *Id.*

Pendergrass tries to avoid this result by suggesting the Bonita Coin Laundry robbery was inconsistent with the other robberies because customers and employees were locked in the bathroom. We disagree.

First, as we have suggested, the evidence from the Bonita Coin Laundry robbery follows many of the material patterns that the other four robberies did. The robber from the Bonita Coin Laundry was taller, brandished a black-and-silver pistol

35

in his left hand, and covered his face from his nose down in the same way that a robber in all the other robberies did.  He also wore white gloves like the left-handed, black-and-silver-pistol-wielding robber in three other robberies, including the Polo's Taqueria and Discount Grocery robberies.  And he wore a red shirt like that same robber in three other robberies, including the Polo's Taqueria robbery.

Second, the forcefulness the robbers displayed during the Bonita Coin Laundry robbery resembled that of the robbers in all the other incidents.  The robbers in the Polo's Taqueria robbery took Morales by the arm and forced him inside where the safe was located.  In the China Star incident, robbers forced the owner and an employee back into the restaurant.  And in the Best Wings robbery, robbers told a patron and employee to return inside and repeatedly demanded a key to the safe.  As for the Discount Groceries robbery, one of the robbers forced Joseph to his knees by pistol-whipping him, and then the taller robber shot Joseph when he tried to reach a gun.  The robbers' actions during the Bonita Coin Laundry robbery in rushing in and forcing the owners and patrons into the bathroom was just more of that same forcefulness exhibited in all five robberies.

In sum, the mosaic and patterns of evidence firmly tie all five robberies to Pendergrass and sufficiently support his convictions on each robbery.

E.    Special Agent Winn's testimony does not warrant vacatur of the convictions.

36

Pendergrass also challenges Special Agent Winn's testimony on three grounds.  First, he argues that large portions of it constituted hearsay.  Second, he asserts that it violated his rights under the Confrontation Clause.  And third, he contends that it amounted to improper opinion testimony.  Because Pendergrass did not object to the admission of this testimony during trial, we review for plain error.  *See Hawkins*, 934 F.3d at 1264.

The admission of evidence constitutes plain error when the evidence was "so obviously inadmissible and prejudicial that, despite defense counsel's failure to object, the district court, *sua sponte*, should have excluded the evidence."  *United States v. Williams*, 527 F.3d 1235, 1247 (11th Cir. 2008) (quotation omitted).  To establish plain error, Pendergrass must satisfy three conditions.  First, he must show that error occurred, and he did not intentionally forfeit or abandon the error.  *Hawkins*, 934 F.3d at 1264.  Second, he must demonstrate that the error was plain, meaning "clear or obvious."  *Id.*  Third, he must prove the error affected his substantial rights.  *Id.*  If Pendergrass can meet these conditions, we may exercise our discretion to notice and correct a forfeited error, but only if the error "seriously affected the fairness, integrity, or public reputation of judicial proceedings."  *Id.* (quoting *United States v. Hernandez*, 906 F.3d 1367, 1370 (11th Cir. 2018)).  This test is rigorous but not impossible.  *Id.*

37

We begin with the hearsay challenge. Pendergrass contests Winn's testimony concerning (1) the contents of the tower-dump records, (2) others' statements about potential suspect Quintarious Luke, (3) the statements of those who said surveillance video was not available, and (4) the statements of Pendergrass's girlfriend and her mother that Pendergrass lived in the basement of their home at 1044 Wenham Lane.

Except for the last category, none of the challenged statements were hearsay because, as we explain below, they were not offered for the truth of the matter asserted. *See* Fed. R. Evid. 801(c). Under our binding case law, statements by out-of-court witnesses to law enforcement may be admitted as non-hearsay if they help explain the course of a complex investigation, and the danger of unfair prejudice caused by the use of the statements does not substantially outweigh the probative value of the evidence. *Jiminez*, 564 F.3d at 1288; *see also United States v. Elysee*, No. 18-14214, 2021 WL 1310551, *25 (11th Cir. Apr. 8, 2021) ("the government in a criminal case may in some circumstances introduce out-of-court statements through investigative officers either (1) to explain the course of a complex investigation or (2) to rehabilitate officers after the defense has impugned their motives or behavior in the investigation."). The first three categories of Winn's challenged testimony fall under this rule because that evidence showed why Winn focused his investigation on Pendergrass and excluded other potential suspects

38

during his investigation.   In this regard, they explain the course of a complex investigation and were not introduced for the truth of the matter asserted.

For example, the government did not offer the testimony about the unavailability of other surveillance videos to prove the accuracy of the statements. Indeed, if offered for the truth of the matter, that type of evidence would not make it more or less likely that a particular suspect committed or did not commit the robberies.  Similarly, the testimony about Quintarious Luke—such as his physical description and use of tower dump data—was not offered to establish the truthfulness of those statements.  Rather, with both categories of information, the government sought to show the steps Winn took during his investigation.  Along the same lines, the government relied on this evidence to refute any defense claims that the government had not investigated all leads and had not obtained all evidence.

Winn's testimony about Quintarious Luke also referred to ballistics—that GBI determined Luke's gun was not used during the robberies.  The testimony perhaps implicates the ballistics testing performed on the bullet casings and cartridge found at the crime scenes.  But during the trial, other witnesses verified the authenticity of those ballistics records.  For instance, GBI forensics expert Weitzel performed a microscopic comparison of the shell casings and cartridge.  He prepared a report on his findings.  And during trial, Weitzel testified that the three shell casings found at Discount Grocery were shot from the same gun as the one casing found at

Best Wings.  He also testified that the bullet cartridge found at Polo's Taqueria was ejected from the same gun as that used during the Discount Grocery and Best Wings shootings.

With respect to the cell-site data, FBI Special Agent Carman testified about how that data was gathered and how it was read and reported.  During his testimony, he described how Pendergrass's phone had "pinged" off certain cell towers near the robbery locations of Polo's Taqueria, Discount Grocery, and Best Wings.  Records reflecting this substantive data were admitted into evidence, and Pendergrass did not object.  So when Agent Winn discussed the records, they were already in evidence, and regardless, he used them for the purpose of explaining his investigative actions.

As for Pendergrass's final hearsay challenge—to his testimony that Pendergrass's ex-girlfriend told police that Pendergrass lived in the basement of her home at 1044 Wenham Lane—we agree with Pendergrass that that statement qualifies as hearsay.  Winn asserted it for the truth of the matter:  that Pendergrass lived at the Wenham Lane address.  But that does not warrant reversal here.

That information was also established through other means.  And in any event, even assuming without deciding that the admission of this evidence could rise to the level of plain error, no reasonable probability of change in the outcome of trial exists.  The government admitted an exhibit from T-Mobile showing subscriber information for Pendergrass.  And that documentation, to which Pendergrass did not object,

40

showed Pendergrass lived at 1044 Wenham Lane.  Besides that, law-enforcement officers conducting surveillance also saw Pendergrass arriving at and leaving from the residence.  Plus, Pendergrass himself admitted that his shirt and other items were located at the address.

We turn next to Pendergrass's Confrontation Clause challenge.  This claim, too, lacks merit.  As we did with the hearsay challenge, we review this claim for plain error since Pendergrass did not object at trial to a violation of the Confrontation Clause.

The Confrontation Clause prohibits the admission of out-of-court statements that are testimonial unless the declarant is unavailable and the defendant had a previous opportunity to cross-examine the declarant.  *See Crawford v. Washington*, 541 U.S. 36, 51–52 (2004).  Our decision in *Jiminez*, however, clarified that the Confrontation Clause "prohibits *only* statements that constitute impermissible hearsay" because "[t]he Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Jiminez*, 564 F.3d at 1286-87 (quoting *Crawford,* 541 U.S. at 59 n. 9).

Because the first three categories of challenged testimony do not qualify as hearsay, Pendergrass's Confrontation Clause challenge with respect to them necessarily fails, too.  Pendergrass asserts that *United States v. Charles*, 722 F.3d 1319 (11th Cir. 2013), requires a different result.  We disagree.  True, we did note

in *Charles* that "a proper Confrontation Clause analysis does not begin or end with a determination of whether a statement constitutes 'impermissible hearsay.'" *Id.* at 1328 n.10. But we explained that the Confrontation Clause analysis "first requires a determination of whether the declarant's statement is testimonial," i.e. a declaration offered for the purpose of proving some fact to be used at trial." *Id.* Only if that is the case does a Confrontation Clause issue arise. *See id.*

Here, though, we have explained that the challenged categories did not constitute "hearsay" because they were not offered for the truth of the matters asserted nor to prove Pendergrass's guilt or any other fact to be used at trial. *Cf. Melendez-Diaz v. Massachusetts,* 557 U.S. 305, 313–14 (2009) (forensic laboratory report indicating that substance was cocaine was "testimonial" for purposes of the Confrontation Clause) and *Bullcoming v. New Mexico*, 564 U.S. 647, 663-65 (2011) (certification as to the results of a blood-alcohol test was "testimonial" for Confrontation Clause purposes). So by definition, they were not "testimonial." Yet the "primary object" of the Sixth Amendment is to limit "testimonial hearsay." *Crawford*, 541 U.S. at 53. Because the statements challenged here are not "testimonial hearsay," the Confrontation Clause was not triggered, so we do not determine whether the relevant witnesses were available to testify or whether Pendergrass had an opportunity to cross-examine them.

But even assuming the district court did err in allowing Winn's challenged testimony, we find no plain error because no reasonable probability exists that any error had a substantial effect on the jury's verdict. *See United States v. Arbolaez*, 450 F.3d 1283, 1291-92 (11th Cir. 2006) (per curiam). As we have discussed in Sections III.C and D, the government introduced a substantial amount of evidence showing that Pendergrass committed the robberies.

As for the evidence from Pendergrass's girlfriend, even assuming without deciding that the admission of that evidence could constitute plain error, Pendergrass cannot show that its admission violated his substantial rights, since the same evidence came in admissibly.

We also reject Pendergrass's argument his convictions must be vacated because Winn offered improper opinion testimony during trial and the government inappropriately used him as a summary witness to review evidence and draw inferences for the jury. As with Pendergrass's other challenges to Winn's testimony, Pendergrass did not object on this basis, either, during trial. For that reason, we again review for plain error. None exists here, and Pendergrass's reliance on our decision in *United States v. Hawkins*, 934 F.3d 1251 (11th Cir. 2019), fails.

In *Hawkins*, the government presented the agent there as an expert, but the agent also testified to matters of fact. As a result, that agent's testimony crossed back and forth between factual testimony and expert opinion. In addition, the

43

*Hawkins* agent provided speculative interpretative commentary on the meanings of entire conversations, as opposed to construing just drug code words used during the conversations and for which he served as an expert.

Here, though, the government did not admit Winn as an expert, so no danger of confusion between factual and expert-opinion testimony existed. Winn also did not purport to have expert knowledge of the subtext of entire conversations consisting of everyday language, like the agent in *Hawkins* did. Rather, Winn simply reviewed the evidence presented, explaining to the jury how he linked Pendergrass to the robberies. His testimony identified the overlapping evidence between the robberies and the robbers' overall modus operandi. And significantly, Winn's testimony was supported by surveillance videos, still pictures, tangible evidence found at Pendergrass's home, ballistics, cell-site data, and other witness testimony.

This case does not involve improper interpretation of evidence that impeded or invaded the function of the jury. Instead, it involves the synthesis of a large volume of already-admitted evidence. And even assuming some of Winn's testimony strayed into the realm of improper interpretation, he was neither the sole nor the primary witness in the case. Rather, the government presented twenty-seven witnesses at trial over five days, and many witnesses testified to the same facts that Winn did. That distinguishes this case from *Hawkins* in yet another way, since the agent there testified for more than half the trial.

44

We also reject Pendergrass's complaint about Winn's testimony on the identity of the person in the surveillance videos. To be sure, Winn did point out the robbers' physical features and did say they matched those of the defendant. But in any event, the district court instructed the jury, "Whether Mr. Pendergrass is the person depicted in the videos is a matter for you, the jury to decide." We assume juries follow the court's instructions. *United States v. Almanzar*, 634 F.3d 1214, 1222 (11th Cir. 2011). Beyond that, during a sidebar, defense counsel explicitly stated she had no objection to the government's asking Winn why he considered Pendergrass a suspect or noting that the suspect was left-handed, tall, and athletic. So any errors in these regards are forfeited, in any event. *See United States v. Brannan*, 562 F.3d 1300, 1306 (11th Cir. 2009) (invited error "stems from the common sense view that where a party invites the trial court to commit error, he cannot later cry foul on appeal.").

For all these reasons, Pendergrass's challenges to Winn's testimony fail.

F.     Even assuming error, cumulative error here does not warrant vacatur of the convictions.

Last, we reject Pendergrass's contention that the cumulative effect of the alleged pre-trial and trial errors we have discussed rendered his trial fundamentally unfair. We review de novo the cumulative impact of trial errors. *United States v. Dohan*, 508 F.3d 989, 993 (11th Cir. 2007). The cumulative-error doctrine calls for reversal of a conviction if, in total, the non-reversible errors result in a denial of the

45

constitutional right to a fair trial.  *United States v. Reeves*, 742 F.3d 487, 505 (11th Cir. 2014).

Our first step in a cumulative-error analysis calls for us to evaluate each claim independently.  *United States v. Margarita Garcia,* 906 F.3d 1255, 1280 (11th Cir. 2018).  Then we survey "the trial as a whole" in assessing whether a defendant received a fundamentally fair trial.  *United States v. Ladson*, 643 F.3d 1335, 1342 (11th Cir. 2011).  No cumulative error exists where a criminal defendant cannot establish that the combined errors affected his substantial rights.  *United States v. Foley*, 508 F.3d 627, 638 (11th Cir. 2007).  A defendant's substantial rights are not affected if "properly admitted evidence sufficiently established [his] guilt."  *United States v. Adams*, 74 F.3d 1093, 1100 (11th Cir. 1996).

Here, the whole is not greater than the sum of the parts.  Even assuming that the admission of the geo-location data was erroneous, and even assuming errors in the admission of some of Winn's testimony, we conclude that Pendergrass has not shown his substantial rights were affected by the aggregation of alleged errors.  As we have reviewed in detail, the evidence against Pendergrass formidably demonstrated his guilt with respect to the charged offenses.  *See Adams*, 74 F.3d at 1100 (substantial rights not affected if sufficient evidence of guilt exists).  Pendergrass received a fundamentally fair trial, so his convictions must be affirmed.

**IV.**

46

For the foregoing reasons, we affirm Pendergrass's convictions on all counts.

**AFFIRMED.**