[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-10408

_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

*versus*

JONATHAN WAYNE DANIELS,

Defendant- Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:19-cr-20708-DPG-1

_____

Before JORDAN, LAGOA, and MARCUS, Circuit Judges.

LAGOA, Circuit Judge:

After a jury convicted Jonathan Daniels of ten counts of Hobbs Act robbery, the district court sentenced Daniels to 180 months' imprisonment. Daniels now appeals his conviction and sentence. He argues that the district court erred by rejecting his proposed jury instruction on eyewitness identifications and that cumulative evidentiary errors prejudiced his right to a fair trial. He also argues that the jury lacked sufficient evidence to convict him under Count 7 of the superseding indictment. Finally, he argues that his sentence was substantively unreasonable.

For the following reasons, we affirm Daniels's convictions and sentence.

## I.    BACKGROUND

A grand jury charged Jonathan Daniels with six counts of Hobbs Act robbery in violation of 18 U.S.C. § 1951(a). About a month-and-a-half later, the government filed a superseding indictment charging Daniels with ten counts of Hobbs Act robbery. Daniels pleaded not guilty to all ten counts, and his case proceeded to a nine-day jury trial in October 2021. At the trial, the government elicited the following evidence, which we summarize by count.

### A.  Count 1: October 7, 2019, Miami 7-Eleven #1

On October 7, 2019, Myrlande Dorziere was working at a 7-Eleven store at 533 NW 103rd St. in Miami, Florida. Around 7:26

p.m., a black male entered the store and asked Dorziere for Newport cigarettes. Dorziere turned to get the cigarettes, and when she turned back towards the man, he was pointing a gun at her. The man said, "Don't do anything stupid. Open both registers and give me the money." Dorziere complied.

According to Dorziere, the robber wore red shoes, a long-sleeve blue shirt, and a brimmed hat "like [the] ones the construction people" wear. When the police showed her a lineup, Dorziere identified Jonathan Daniels as the robber, stating that she knew it was Daniels "[a]s soon as [she] saw [Daniels's] picture." Cell site data showed that Daniels's cellphone was detected in the general area of 533 NW 103rd St. between 7:06 p.m. and 7:15 p.m. on the day of the robbery. The robbery occurred around 7:26 p.m.

### B. Count 2: October 7, 2019, Miami 7-Eleven #2

On October 7, 2019, Michael Keesee was working at a 7-Eleven at 10300 NW 12th Ave. in Miami, Florida. Around 7:40 p.m. that evening, a black male wearing red shoes, dark pants, a long-sleeve blue shirt, and a brimmed hat entered Keesee's store. The man asked for a pack of Newport cigarettes, Keesee turned to get them, and when Keesee turned back, the man was pointing a gun at him. Keesee jumped at the sight of the gun, and the robber said, "Just calm down. That could have got you killed. Just give me the money." Keesee complied.

Later, Keesee could not identify the robber in a lineup. But cell site data showed that Daniels's cell phone was at or near the

scene of the robbery at 7:34 p.m.  The robbery occurred at roughly 7:40 p.m.

### C. Count 3: October 9, 2019, Hialeah Murphy's

On October 9, 2019, Magaly Perez was working at a Murphy's gas station at 5851 NW 177th St. in Hialeah, Florida.  Shortly after 8:00 p.m., a black male wearing dark pants, a long-sleeve shirt, and a brimmed hat entered the store.  He picked up a drink bottle and then approached the cash register.  The man placed the bottle on the counter and drew "a small gun."  "You bitch . . . , give me the money in the register," the man said.  Perez complied.

During a police lineup, Perez identified Daniels as the robber.  Police could not locate Daniels's cell site data at the time of this robbery because there was "no activity for [them] to map."

### D. Count 4: October 10, 2019, Miami 7-Eleven #3

On October 10, 2019, Trishana Chamberlain and Marytha Darbouze were working at a 7-Eleven located at 90 NW 167th St. in Miami, Florida.  Around 7:00 p.m. that evening, a black male wearing red shoes, dark pants, a long-sleeve shirt, and a brimmed hat entered the store and asked Darbouze for a pack of Newport cigarettes.  Darbouze turned to grab the cigarettes, but when she turned back to the cash register, the man had pulled out a pistol. The man also pointed his gun at Chamberlain and told her to "put the money on the counter."  After taking the money, the man

walked out of the store, and Darbouze watched him proceed toward the Roadway Inn across the street.

Daniels's cell site data showed that, during the robbery, his phone was at or near the crime scene. Chamberlain identified Daniels as the robber in a lineup. Darbouze said that she thought that the robber had a gold tooth, but she did not identify anyone in the lineup as the robber.

### E. Count 5: October 10, 2019, Miami 7-Eleven #4

On October 10, 2019, Coralia Padilla was working the 2 p.m.-to-8 p.m. shift at a 7-Eleven located at 1550 Ives Dairy Rd. in Miami, Florida. A black male in red shoes, dark pants, a long-sleeve shirt, and a brimmed cap entered the store, pointed a gun at Padilla, and said, "Don't do anything stupid. Just give me the money." Padilla complied. Later, Padilla could not identify the robber in a lineup, but cell-site data showed that Daniels's phone was near the robbery at 6:16 p.m. on October 10, 2019.

### F. Count 6: October 11, 2019, Pembroke Park Subway

On October 11, 2019, Ashley Benitez was working at a Subway restaurant at 4529 W Hallandale Beach Blvd. in Pembroke Park, Florida. Security footage shows a black male with a brimmed hat, a long-sleeve blue shirt, pants, and red shoes enter the Subway at 3:19 p.m. Benitez testified that the man "came in like a normal customer" and that she "asked him what he needed." The man then "pointed a gun in [her] face" and "told [her] to give him all the

money" or "he would kill" her.  Benitez complied, and the man left the store.

Benitez identified Daniels in a lineup as the robber, saying she was "a hundred percent sure" of her identification.  Daniels's cell phone was detected in the general area of the Subway at 4:37 p.m. on the day of the robbery.

### G. Count 7: October 11, 2019, Miami Gardens 7-Eleven

On October 11, 2019, roughly two hours after the Subway robbery, a black male with a brimmed hat, a dark long-sleeve shirt, dark pants, a red umbrella, and red shoes entered a 7-Eleven at 19905 NW 2nd Ave. in Miami Gardens, Florida.  Surveillance footage showed the man walking to the front counter, lawfully buying a pack of Newport cigarettes, and leaving the store.  Ten minutes later, the man returned, reached into his pocket, and pulled out a pistol.  The man pointed his pistol at the cashier who was cutting pizzas nearby.  The cashier stopped cutting the pizza and started emptying the cash register.  After the cashier gave him the money, the man walked away.

The cashier never testified at trial, but Shari Richard, the store manager, testified that the surveillance footage was from the 7-Eleven on October 11, 2019.  She confirmed that the footage depicted the robber and Reynoldo Thomas, the 7-Eleven employee who emptied the cash register.  Daniels's cell site data suggests that he was in the area of the 7-Eleven around 5:16 p.m.  The store's surveillance footage suggests that the robbery occurred at roughly 5:36 p.m.

### H. Count 8: October 12, 2019, Miami Chevron

On October 12, 2019, Tania Lugo was working at a Chevron gas station at 18305 NW 57th Ave. in Miami, Florida.  Surveillance footage showed a black male entering the store while wearing a brimmed hat, a long-sleeve shirt, and dark pants.  According to Lugo, the man approached the register and asked for a pack of Newport cigarettes.  Lugo turned to get the cigarettes, and when she turned back toward the man, he pulled out a gun.  The man pointed the gun at Lugo's stomach and told her to "give him the bills."  She complied.

Lugo later identified Daniels in a lineup as the robber.  Mariyol Mendez, another Chevron cashier who was present, also identified Daniels in a lineup and said that she was a "[h]undred percent sure" that Daniels was the robber.  Daniels's cellphone was located in the vicinity of the robbery at 6:51 p.m. on October 12, 2019.  Mendez testified that the robbery occurred sometime around 7:00 p.m.

### I.  Count 9: October 14, 2019, Miramar 7-Eleven

On October 14, 2019, Andrew Arce was working at a 7-Eleven at 11150 Pembroke Rd. in Miramar, Florida.  Around 8:30 p.m., the black male in dark pants, a long-sleeve shirt, and a brimmed hat robbed the store.  Arce testified that the man "robbed [him] at gunpoint" and said something like "come over here, big man," or "open the register."  Arce complied.

Arce identified Daniels as the robber in a lineup but acknowledged that another person in the lineup gave him pause.  Arce

ultimately selected Daniels because Daniels "looked the most familiar" to him. Daniels's cell site data placed his phone near the robbery at 8:23 and 8:24 p.m.—a few minutes before the robbery occurred.

### J.  Count 10: October 14, 2019, Pembroke Pines Marathon

On October 14, 2019, Yavima Casadevall was working at a Marathon gas station at 7191 Pembroke Rd. in Pembroke Pines, Florida. Shortly before 9:00 p.m., a black male in dark pants, a long-sleeve shirt, and a brimmed hat entered the store, drew a gun, and told Casadevall to give him all the money in her cash register. He also demanded a pack of Newport cigarettes. Casadevall complied and the robber left on foot.

Cell site data showed that Daniels's phone was near the scene of the robbery when it occurred. Casadevall also identified Daniels as the robber in a lineup but struggled while making her identification. Because Casadevall was struggling to identify the robber, the officer conducting the lineup showed Casadevall two still pictures of the robbery from the surveillance footage "[a]s a refresher." After she was shown the images captured by surveillance, she looked at the lineup again and identified Daniels as the robber.

### K.  Daniels's Arrest on October 15, 2019

On the evening of October 15, 2019, the police surveilled a black Jeep Liberty registered to Jonathan Daniels. Officers observed the Jeep park at a Motel 7, and officers discovered that Daniels was renting one of the rooms at the Motel 7. When the officers

arrived at the motel, Daniels fled through the back window of his room and started running toward a nearby highway. An officer ran after Daniels and apprehended him on the on-ramp to the highway.

After securing a warrant, the officers searched Daniels's hotel room and his Jeep Liberty. Among other things, they discovered red boots, a brimmed hat, Newport cigarettes, and a red umbrella (resembling the red umbrella the robber carried during the Miami Gardens 7-Eleven crime).

A forensic examiner with the Federal Bureau of Investigation ("FBI") also generated a report based on data extracted from Daniels's cell phone. The FBI examiner determined that on October 12, 2019, and October 13, 2019, someone used the internet browser on Daniels's phone to search terms such as "[r]obbery at gas station," "7-Eleven gas station robbery," "Miami robbery today," and "[g]as station robbery today." On October 12, 13, and 15, someone also used Daniels's phone to search for terms such as "[g]as station robbery today," "[r]obbery at 7-Eleven on 215th Street," "MIAM 8 gas station robbery at gas station," "[r]obbery at gas station," and "[a]rmed robbery of gas station last night." Additionally, on October 15, someone used Daniels's phone to search for "[a]rmed robbery of gas station last night top ten news," "[a]rmed robbery gas station last night Broward County," "[g]as station robbery on Channel 10 News," "[g]as station robbery in Broward County," "[a]rmed robbery at gas station in Broward County on Channel 10 News," and "Channel 10 News gas station."

### L.  Daniels's Rule 29 Motion, the District Court's Jury Instructions, and the Jury's Verdict

Once the prosecution and the defense rested, Daniels moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29 as to Count 2, Count 5, and Count 7.  The district court denied Daniels's motion in full.

After the district court denied Daniels's Rule 29 motion, the court considered the parties' proposed jury instructions.  The government proposed that the district court use this Court's pattern instruction on eyewitness identification, which states:

> If a witness identifies a Defendant as the person who committed the crime, you must decide whether the witness is telling the truth.  But even if you believe the witness is telling the truth, you must still decide how accurate the identification is.  I suggest that you ask yourself questions:
>
> > 1. Did the witness have an adequate opportunity to observe the person at the time the crime was committed?
> >
> > 2. How much time did the witness have to observe the person?
> >
> > 3. How close was the witness?
> >
> > 4. Did anything affect the witness's ability to see?
> >
> > 5. Did the witness know or see the person at an earlier time?

> You may also consider the circumstances of the identification of the Defendant, such as the way the Defendant was presented to the witness for identification and the length of time between the crime and the identification of the Defendant.
>
> After examining all the evidence, if you have a reasonable doubt that the Defendant was the person who committed the crime, you must find the Defendant not guilty.

11th Cir. Crim. Pattern Instr. S3.

On the other hand, Daniels proposed using the Third Circuit's model instruction on eyewitness identification. *See* 3d Cir. Model Crim. Jury Instr. § 4.15. And during the charge conference, Daniels focused on five factors from the Third Circuit's instruction that he believed our instruction fails to address. The five factors that Daniels highlighted were: (1) "how closely the witness was paying attention to the person"; (2) "whether the witness was under stress while observing the person who committed the crime"; (3) "whether the witness and the person committing the crime were of different races"; (4) "whether the witness gave a description of the person who committed the crime," and, if so, "how the witness's description of the person who committed the crime compares to the defendant"; and (5) "whether the witness made the identification while exposed to the suggestive influences of others." 3d Cir. Model Crim. Jury Instr. § 4.15.

The district court rejected Daniel's request to use the Third Circuit's model instruction. But the district court supplemented

our pattern instruction with the "race" and "stress" factors from the Third Circuit's model instruction. Thus, in addition to the usual factors from our pattern instruction, the final instruction "suggest[ed]" that the jury consider:

> 6. Was the witness under stress while observing the person who committed the crime?
>
> 7. Were the witness and the person committing the crime of different races?

The final instruction, however, did not include the other factors that Daniels highlighted from the Third Circuit's version. The district court explained that the "close attention" factor was unnecessary because it was already encapsulated by our pattern instruction's direction that the jury should ask "[h]ow much time" the witness had to observe the robber. *See* 11th Cir. Crim. Pattern Instr. S3. Next, the district court rejected the "witness description" factor because the defendant had presented no evidence suggesting that witnesses gave inaccurate descriptions of Daniels. Finally, the district court rejected the "suggestive influence" factor because our pattern instruction already directed the jury to consider "the circumstances of the identification of the Defendant, such as the way the Defendant was presented to the witness for identification." *See id.*

The jury ultimately convicted Daniels on all ten counts of Hobbs Act robbery as alleged in the superseding indictment.

### M. Sentencing

At sentencing, both parties agreed that the applicable sentencing guidelines yielded an offense level of 28, resulting in a guideline range of 110 to 137 months' imprisonment. But the government moved for an upward variance, urging the district court to impose at minimum a sentence of 15 to 17 years in prison. Citing Daniels's extensive criminal history and its duty to protect the public, the district court found that a sentence above the guideline range was appropriate and granted the motion, sentencing Daniels to 180 months in prison.

Daniels now timely appeals.

### II.        STANDARDS OF REVIEW

We review a district court's refusal to give a requested jury instruction for an abuse of discretion. *United States v. King*, 751 F.3d 1268, 1275 (11th Cir. 2014).

We also review the cumulative impact of trial errors de novo. *United States v. Pendergrass*, 995 F.3d 858, 881 (11th Cir. 2021). "No cumulative error exists where a criminal defendant cannot establish that the combined errors affected his substantial rights." *Id.* Further, we review unpreserved trial errors for plain error. *United States v. Margarita Garcia*, 906 F.3d 1255, 1266 (11th Cir. 2018). And if a district court sustains an objection at trial, but the objecting party did not request further curative action, we review the district

court's failure to take further curative action for plain error. *See United States v. Mosquera*, 886 F.3d 1032, 1046 (11th Cir. 2018).

Further, "[w]e review *de novo* whether sufficient evidence supports a conviction, resolving all reasonable inferences in favor of the verdict." *United States v. Farley*, 607 F.3d 1294, 1333 (11th Cir. 2010). "In reviewing evidentiary sufficiency, 'we must determine whether the evidence, construed in the light most favorable to the government, would permit the trier of fact to find the defendant guilty beyond a reasonable doubt.'" *Id.* (quoting *United States v. Brown*, 415 F.3d 1257, 1270 (11th Cir. 2005)). "We will not reverse unless no reasonable trier of fact could find guilt beyond a reasonable doubt." *Id.*

And we review the substantive reasonableness of a sentence "under a deferential abuse-of-discretion standard." *Gall v. United States*, 552 U.S. 38, 41 (2007).

## III.    ANALYSIS

On appeal, Daniels advances several arguments. First, he argues that the district court erroneously rejected his proposed jury instruction on eyewitness identifications. Second, he claims that cumulative errors prejudiced his right to a fair trial. Third, he argues that there was insufficient evidence to convict him under Count 7 of the superseding indictment. Finally, he argues that his

sentence was substantively unreasonable.  We address these issues in turn.

## A.  Jury Instruction

First, Daniels argues that the jury's verdict should be vacated because the district court did not adopt his proposed instruction on eyewitness identification from the Third Circuit's model instructions.  *See* 3d Cir. Model Crim. Jury Instr. § 4.15.  In response, the government argues that the district court correctly declined to adopt Daniels's proposed instruction because the pattern instruction "substantially covered" the proposed instruction and, in any event, the district court's instruction did not "substantially impair" Daniels's ability to present an effective defense.  *See* 11th Cir. Crim. Pattern Instr. S3.  The government is correct.

"A trial court is not bound to use the exact words and phrasing requested by defense counsel in its jury charge."  *United States v. Gonzalez*, 975 F.2d 1514, 1517 (11th Cir. 1992).  Rather, "a district court 'has wide latitude in determining the exact formulation of the jury instruction.'"  *United States v. Mayweather*, 991 F.3d 1163, 1175 (11th Cir. 2021) (quoting *United States v. Gaines*, 690 F.2d 849, 856 (11th Cir. 1982)).  And when "a district court declines to give a requested jury instruction for which there was a sufficient evidentiary basis, we will reverse 'only if: (1) the requested instruction correctly stated the law; (2) the actual charge to the jury did not substantially cover the proposed instruction; and (3) the failure to give the instruction substantially impaired the defendant's ability to present an effective defense.'"  *King*, 751 F.3d at 1275 (quoting *United*

*States v. Palma*, 511 F.3d 1311, 1315 (11th Cir. 2008)). "In determining whether an instruction substantially covered the proposed instruction, we 'need only ascertain whether the charge, *when viewed as a whole*, fairly and correctly states the issues and the law.'" *Id.* (emphasis added) (quoting *Gonzalez*, 975 F.2d at 1517).

In this case, the district court instructed the jury to consider whether the eyewitnesses' identification testimony was accurate and "suggest[ed]" a number of factors that the jury may consider when making this determination. Under our precedent, that was sufficient to substantially cover Daniels's proposed instruction on eyewitness identifications. We find *King* to be particularly instructive.

In *King*, the defendant proposed that the district court supplement our pattern instruction on witness identification with a couple of sentences about cross-racial identification. 751 F.3d at 1275. The defendant's proposed instruction stated:

> You may also consider whether an identifying witness is not of the same race as the Defendant and whether that fact might have had an impact on the accuracy of the witness's original perception, and/or the accuracy of the subsequent identification. You should consider that, in ordinary human experience, people may have greater difficulty in accurately identifying members of a different race.

*Id.* The district court rejected this proposed instruction and instead used our pattern instruction, which was an older version of, but materially identical to, the pattern instruction at issue here. *See id.*

at 1276. Viewing the district court's instruction "as a whole," we held that the instruction "was sufficiently comprehensive to assist the jury in evaluating the witnesses' identification testimony." *Id.* We explained that our pattern instruction "highlighted potential questions for the jurors while also suggesting that those questions were not the only factors they should consider." *Id.* The district court's instruction also informed the jury that "they should assess the reliability of the identifications even if they believed the witnesses were telling the truth," suggested that the jury "should consider the identification procedure," and informed the jury that "if they had a reasonable doubt regarding the identity of the defendant as the robber, they should find him not guilty." *Id.*

Thus, under *King*, the district court, in its instruction on evaluating eyewitness identifications, is not required to explicitly address every potential problem with eyewitness identifications raised by the defendant. *See id.* Instead, the district court may provide a non-exhaustive list of questions that are generally relevant to evaluating eyewitness identifications, and counsel, in closing arguments, may suggest other questions that may be relevant to evaluating the particular eyewitness identification in the case. *Id.*

Applying *King* here, the district court's instruction used broad language that required the jury to evaluate eyewitness identifications. The instruction highlighted specific considerations as examples, not as an exclusive list. In the end, the instruction required jurors to consider "how accurate" a witness's "identification is." The instruction then stated, "I *suggest* that you ask yourself [the

following] questions . . . ." (Emphasis added). After enumerating that list of questions, the instruction stated, "You *may* also consider . . . ." (Emphasis added). Finally, the instruction concluded, "After examining *all* the evidence, if you have a reasonable doubt that the Defendant was the person who committed the crime, you must find the Defendant not guilty." (Emphasis added). This language suggests that the specific factors enumerated by the district court are neither exclusive nor mandatory considerations.[1] We thus conclude that the district court's use of our pattern instruction substantially covered Daniels's proposed instruction, and we affirm as to this issue.

## B. Cumulative Error

Daniels next argues that cumulative errors prejudiced his right to a fair trial. He highlights four potential errors—only one of which he objected to at trial. As he acknowledges, the district court sustained his objection in the one instance when he did object. His argument about the sustained objection is that "the damage was done" by the time he objected. But Daniels never moved to strike the improper testimony and never requested a limiting

---

[1] Indeed, during closing argument, Daniels's counsel said, in reference to the witness identification instruction, "The Judge will list several factors, and they're not exclusive. You can make your own determinations and judge the accuracy of the identifications." Daniels then highlighted additional factors that the jury should consider, such as the accuracy of a witness's description of the robber.

instruction. For the reasons below, we conclude that Daniels fails to demonstrate cumulative error requiring reversal.

### 1. Background

"The cumulative-error doctrine calls for reversal of a conviction if, in total, the non-reversible errors result in a denial of the constitutional right to a fair trial." *Pendergrass*, 995 F.3d at 881. "Our first step in a cumulative-error analysis calls for us to evaluate each claim independently." *Id.* (citing *Margarita Garcia*, 906 F.3d at 1280). Then, "we survey 'the trial as a whole' in assessing whether a defendant received a fundamentally fair trial." *Id.* (quoting *United States v. Ladson*, 643 F.3d 1335, 1342 (11th Cir. 2011)).

Plain-error review applies to each of Daniels's claims of evidentiary error because he failed to preserve the issues "by unambiguously flagging the mistake and contemporaneously objecting." *Margarita Garcia*, 906 F.3d at 1263. Below, Daniels failed to object to any of the potential errors that he now highlights on appeal. To be sure, Daniels did object in one instance relevant to this appeal, which the district court sustained, but Daniels failed to request a limiting instruction after that. Because Daniels did not request a limiting instruction or move to strike the improper testimony, we review Daniels's argument that the district court should have done so for plain error. *Mosquera*, 886 F.3d at 1046 (holding that the trial court's failure to strike an offending statement "is reviewable only for plain error" when counsel does not move to strike).

Under plain-error review, we "may only correct an unpreserved claim if the defendant proves '(1) error, (2) that is plain, and (3) that affects substantial rights.'" *Margarita Garcia*, 906 F.3d at 1266 (emphasis removed) (quoting *United States v. Rodriguez*, 398 F.3d 1291, 1298 (11th Cir. 2005)). If all three conditions are met, we may then exercise our discretion "to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 1266–67 (quoting *Rodriguez*, 398 F.3d at 1298). "The admission of evidence constitutes plain error when the evidence was 'so obviously inadmissible and prejudicial that, despite defense counsel's failure to object, the district court, *sua sponte*, should have excluded the evidence.'" *Pendergrass*, 995 F.3d at 878 (quoting *United States v. Williams*, 527 F.3d 1235, 1247 (11th Cir. 2008)).

Plain error review is different from harmless error review in several respects. *Margarita Garcia*, 906 F.3d at 1267. First, "relief under plain error review is discretionary, meaning that, even if a defendant establishes prejudice, her convictions might still be affirmed." *Id.* Second, "unlike harmless error—where the government carries the burden—the onus of establishing prejudice under plain error rests with the defendant." *Id.* Third, "[t]he measure of prejudice under plain error review—the third prong of the plain error test—'requires that an error have affected substantial rights, which almost always requires that the error must have affected the outcome of the district court proceedings.'" *Id.* (quoting *Rodriguez*, 398 F.3d at 1299). With these principles in mind, we turn to Daniels's alleged evidentiary errors.

### 2. Detective Garcia: Criteria for Hobbs Act Robbery

Daniels argues that the district court committed plain error by allowing the following exchange between the government and Elio Garcia, a detective with the Miami Dade Police Department:

> Q.  Tell us how you first got involved?
>
> A.  I noticed a string of commercial robberies happening within Miami-Dade County jurisdiction.  Based on the description and the method of operation, I thought they were related; at which time I contacted the county detectives and asked them if they would like to proceed with federal prosecutions on this case, because the crimes that were being committed did *fit the criteria for Hobbs Act robberies.  They agreed*, at which time I contacted the Federal Bureau of Investigations and requested assistance in investigating these crimes.

(Emphasis added).  On appeal, Daniels argues that this testimony was improper because whether each robbery satisfied the "criteria" of the Hobbs Act was a question for the jury to decide based on the law as instructed by the district court.  Daniels also argues that this error was compounded by Detective Garcia's statement that "the county detectives" "agreed" with him, which is hearsay according to Daniels.

Daniels has not shown plain error here.  Daniels correctly notes that a witness "may not testify to the legal implications of conduct; the court must be the jury's only source of law." *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990); *see United States v. Grzybowicz*, 747 F.3d 1296, 1310 (11th Cir. 2014)

(relying on *Montgomery* in a criminal case). The government therefore could not use Detective Garcia to offer an opinion on the meaning of the Hobbs Act or the legal implications of Daniels's conduct.

But the government responds that no error occurred because Detective Garcia's statement was not offered for that purpose but offered merely as background information. We agree. Reviewing Detective Garcia's mention of the Hobbs Act robbery criteria in context, the government did not present Detective Garcia's testimony as a genuine opinion on Daniels's ultimate guilt; rather, the testimony was merely a background detail explaining how the detective and the FBI became involved in the investigation. *Cf. Grzybowicz*, 747 F.3d at 1310–11. Given this context, we cannot say that Detective Garcia's testimony was "so obviously inadmissible and prejudicial that, despite defense counsel's failure to object, the district court, *sua sponte*, should have excluded the evidence." *See Williams*, 527 F.3d at 1247 (quoting *United States v. Smith*, 459 F.3d 1276, 1300 (11th Cir. 2006) (Tjoflat, J., concurring)).

Additionally, Detective Garcia's testimony that "the county detectives" "agreed" with him was not hearsay. Statements that are not offered for the truth of the matter asserted are not hearsay. *See United States v. Hawkins*, 905 F.2d 1489, 1494 (11th Cir. 1990) ("A statement is not subject to the hearsay rule . . . unless it is offered 'to prove the truth of the matter asserted.'" (quoting Fed. R. Evid. 801(c)(2))). These statements were not offered to prove the truth of the idea that the robberies satisfied the criteria for Hobbs Act

robbery. Instead, they were offered to explain why the FBI became involved in the investigation. Thus, the statements are not hearsay.

### 3. *Detective Garcia: Red Shoes and Arm Swing*

Next, Daniels objects—for the first time on appeal—to the following exchange that the government had with Detective Garcia:

> Q. [W]as there anything distinct about the person's walk that made you believe it was the same individual?
>
> A. . . . Yes, absolutely the very distinct arm swing is what caught our attention also. If you notice, not on this video clip but on the video clip from the Blades Car Wash, you could distinctly see red sneakers that he's wearing. Part of the description that we got from the victims was red sneakers.
>
> So we were able to match this subject that we now see on camera, we were able to tie him to the robbery based on his clothing and the distinct arm swing that he had as he was walking back to the [black Jeep Liberty].

Daniels argues that Detective Garcia's statements about the robber's red shoes and the robber's distinct arm swing are inadmissible for several reasons. First, he argues that the statements about the robber's red shoes and arm swing violated Federal Rule of Evidence 701 because the statements were based on witness testimony and evidence that Detective Garcia reviewed instead of the detective's own perception. Second, he argues that the statements about

the robber's red shoes and arm swing violated the Confrontation Clause. Finally, he argues that Garcia's statements about the robber's red shoes and arm swing are inadmissible hearsay. Daniels further contends that Detective Garcia's statements prejudiced him because his "identification of the suspect in count 4 was the most direct evidence connecting" Daniels's black Jeep Liberty "to any robbery." But Daniels acknowledges that "a black Jeep Liberty was also seen on surveillance footage near two other robberies" and that he owned a black Jeep Liberty.

Daniels fails to prove plain error under any of these theories, and even if he did, Daniels does not satisfy his burden to prove prejudice. First, Daniels fails to prove plain error under Rule 701. In *Pendergrass*, we held that a district court did not commit plain error by allowing an FBI agent to testify about evidence that he reviewed that "linked" the defendant to robberies. 995 F.3d at 881. The agent "identified the overlapping evidence between the robberies and the robbers' overall modus operandi," and the agent's testimony was supported "by surveillance videos, still pictures, tangible evidence found at [the defendant's] home, ballistics, cell-site data, and other witness testimony." *Id.* Similarly here, the district court did not plainly err by allowing Detective Garcia to testify that he linked the individual who entered the black Jeep Liberty to the robberies because of the individual's red shoes and distinct arm swing. The robbers' red shoes were already supported by witness testimony and video evidence presented to the jury. Furthermore, at the time that Detective Garcia referenced the robber's distinct arm swing, it was unclear whether Detective Garcia was testifying based on his

own perception or a witness's testimony. Detective Garcia testified about the arm swing as a matter of fact; he never said that he learned about it from bystanders. Thus, when he testified to the arm swing, it was not immediately obvious that he was relaying information that was not rationally based on his own perception. Again, plain error is error so obvious that the district court is expected to intervene *sua sponte* even if the defendant does not object. *Williams*, 527 F.3d at 1247. This evidence does not rise to that level.

Next, Daniels argues that the government violated the Confrontation Clause when Detective Garcia said that the robber had a distinct arm swing and red shoes. Detective Garcia testified that the robbery victims told him that the robber was wearing red sneakers. However, this statement did not violate the Confrontation Clause because the victims of that particular robbery—Trishana Chamberlain and Marytha Darbouze—both testified at the trial and were available for cross-examination. In any event, the surveillance footage showed that the robber was wearing red shoes during the robbery. As for the "arm swing" evidence, it was unclear from Garcia's testimony whether he was relaying the testimonial statements of another witness. *See Crawford v. Washington*, 541 U.S. 36, 68 (2004) (holding that the Confrontation Clause applies only to testimonial statements). The district court is not obliged to interject whenever a detective testifies to a fact to ensure that the detective is not simply relaying facts that he learned from someone else. The district court thus did not plainly err in this manner.

Finally, Daniels argues that the district court plainly erred by allowing Detective Garcia to relay inadmissible hearsay about the robber's shoes and arm swing.  As with the Confrontation Clause argument, the robber's red shoes were a fact already in evidence. It was also unclear from Detective Garcia's testimony that his statements about the arm swing are hearsay.  He never said that he was relaying what someone else told him.  Daniels hypothesizes that Garcia was relaying hearsay because Agent Jarid Wesley—a witness who testified *after* Garcia—testified that he learned about the arm swing from three or four individuals who worked at a nearby carwash.  In his reply brief, Daniels cites *Hackett v. Housing Authority of City of San Antonio*, 750 F.2d 1308, 1312 (5th Cir. 1985), for the proposition that "evidence derived from hearsay is inadmissible." But when Detective Garcia said that the robber had a distinct arm swing, Agent Wesley had not yet testified that he learned this fact from bystanders.  And even now, it is not clear that Detective Garcia learned about the distinct arm swing from bystanders.  Daniels's argument is grounded in speculation and thus does not show that the district court plainly erred.

Moreover, even if Daniels demonstrated the existence of (1) an error (2) that was plain, he fails to show prejudice, which requires him to demonstrate "a reasonable probability" that the trial outcome would have been different if the district court excluded the evidence. *See Margarita Garcia*, 906 F.3d at 1267.  Daniels argues that Detective Garcia's statements prejudiced him because they were the best evidence connecting Daniels's Jeep Liberty to the robberies.  But as Daniels acknowledges, there was other evidence

suggesting that his Jeep Liberty was near the scene of some of the robberies.

And even if the jury never heard evidence about the Jeep Liberty, Daniels fails to show that he would not have been convicted based on the other evidence. Indeed, the jury heard other significant evidence against Daniels, including cell-site data, surveillance footage, witness testimony, and modus operandi evidence, among other sources. Daniels does not successfully explain why the jury would have acquitted him even if the jury did not know about the black Jeep Liberty. Thus, he fails to demonstrate prejudice.

### 4. *Agent Wesley: Arm Swing*

Next, Daniels argues that the district court plainly erred during Agent Jarid Wesley's testimony, even though the district court sustained counsel's objection to Agent Wesley's offending statement:

Q. On or about October 11, 2019, did you and other special agents of the FBI canvass the area around the Advantage Destination?

A. Yes.

Q. And can you describe what you observed during this time?

A. So on that day, I believe it was the 7-Eleven on 194th, we were walking around. And behind the 7-Eleven there was a business called Blades Auto Detailing. There was three or four individuals there that

worked, I am assuming at Blades, and we were asking them if they saw anything from the robbery that happened, I believe it was the day before. And they described that they saw an individual walking with an exaggerated arm motion right after –

MR. COHEN: Objection. Hearsay.

MR. ALEXANDER: I'll rephrase the question, Your Honor.

THE COURT: All right. Sustained.

Daniels argues that the district court violated the Confrontation Clause and improperly allowed hearsay because of Agent Wesley's statement, combined with Detective Garcia's earlier statement about the robber's red shoes and distinct arm motion. Daniels contends that through the combined testimony of Agent Wesley and Detective Garcia, the jury learned that the man seen on surveillance footage entering a black Jeep Liberty was the same person who committed the robbery alleged in Count 4.

Daniels fails to demonstrate plain error. First, Daniels does not explain how the district court erred. Indeed, the district court sustained Daniels's objection to Wesley's testimony. But after successfully objecting, Daniels did not move to strike or for a limiting instruction from the district court. To the extent that Daniels believes that the district court plainly erred by failing to strike the testimony *sua sponte*, his argument is foreclosed by precedent. *See Mosquera*, 886 F.3d at 1046 ("It was not plain error—indeed, it was not error at all—for the court to not strike the question *sua sponte*.").

Second, even if Daniels could prove error, he fails to demonstrate prejudice for the same reasons that he failed to demonstrate prejudice with respect to Detective Garcia's testimony about the robber's distinct arm swing. As explained above, even without evidence connecting Daniels's Jeep Liberty to the robberies, there is no "reasonable probability" that the jury would have acquitted Daniels, given the other evidence against him. *See Magarita Garcia*, 906 F.3d at 1267.

### 5. *Detective Hyatt: Security Footage Showed Jonathan Daniels*

Finally, Daniels argues that the district court plainly erred by allowing the following testimony from Pembroke Pines Detective Brad Hyatt:

> Q. All right. Now in this particular case, did you know who the suspect was? Or at some point did you learn who the suspect was?
>
> A. Yes.
>
> Q. Did you know whose photograph the suspect matched?
>
> A. Yes, I did.
>
> Q. And was a photographic lineup shown to the cashier, Yavima Casadevall?
>
> A. Yes, it was.
>
> Q. Who put together that photographic lineup?
>
> A. It was provided to me from—I believe it was Miami-Dade that put together that particular lineup.

30                    Opinion of the Court                    22-10408

Q. Did you know which photograph matched the defendant?

A. I would be able to pick him out of there, yes, I would.

Q. Say that one more time.

A. I knew who he was in there, yes.

. . .

Q. Detective, is there another point in the conversation with Yavima where you speak again?

A. There was another point where I show a picture of the robbery as a refresher for her.

Q. And when you say a picture of the robbery, where did you get the picture from?

A. There was a still picture off, like, the surveillance cameras of him, you know, printed up on a piece of, you know, just normal paper.

Q. Was it a picture of Jonathan Wayne Daniels?

A. Yes.

Q. Aside from the robbery?

A. A picture in the store doing the robbery.

Q. And why did you show her that picture?

A. As a refresher.

Q. And did you tell her that?

A. Yes.

22-10408                Opinion of the Court                31

Daniels argues that Detective Hyatt's testimony violated Federal Rule of Evidence 701. Daniels contends that Detective Hyatt first told the jury that, at the time of the photo lineup, he knew the identity of the robbery suspect and then later said that the person depicted in a still image from the robbery *was* the defendant, Daniels.

Daniels is correct that Hyatt's testimony contravened Rule 701(a). Hyatt was not an eyewitness to any of the robberies, and therefore, his identification of Daniels was not "rationally based on [his] perception." Fed. R. Evid. 701(a). To be sure, "lay opinion identification testimony may be helpful to the jury where . . . 'there is some basis for concluding that the witness is more likely to correctly identify the defendant from [surveillance footage] than is the jury.'" *United States v. Pierce*, 136 F.3d 770, 774 (11th Cir. 1998) (quoting *United States v. Farnsworth*, 729 F.2d 1158, 1160 (8th Cir. 1984)). But the government does not explain why Hyatt was more likely than the jury to correctly analyze the surveillance footage. Thus, Hyatt's opinion violated Rule 701(a).

Yet, to succeed in his appeal, Daniels must also prove that this error was "plain" and prejudiced his "substantial rights." *Margarita Garcia*, 906 F.3d at 1266 (quoting *Rodriguez*, 398 F.3d at 1298). And even then, we "may" exercise our discretion to notice the error, "but only if . . . the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 1266–67 (quoting *Rodriguez*, 398 F.3d at 1298).

Assuming that the district court committed error that was plain, Daniels fails to prove that this error prejudiced his substantial rights, i.e., "a reasonable probability that, but for the error, a different outcome would have occurred." *See id.* at 1267. Even without Hyatt's misstatement, there is not a reasonable probability that the jury would have acquitted Daniels. As we have already noted, the government demonstrated Daniels's guilt beyond a reasonable doubt through cell-site data, surveillance footage, eyewitness testimony identifying Daniels as the robber, modus operandi evidence, evidence that Daniels owned clothing that resembled the robber's clothing, and evidence that Daniels searched for news about the robberies after he completed them.

Daniels also fails to establish prejudice because the district court's jury instruction on identification testimony emphasized that if a witness identifies Daniels as the person who committed the crime, the jury "must still decide how accurate the identification is." "We assume juries follow the court's instructions." *Pendergrass*, 995 F.3d at 881. Hyatt's testimony did not relieve the jury of its own obligation to decide whether Daniels was the robber depicted in the surveillance video.

### 6. *There is No Cumulative Error Requiring Reversal*

"In addressing a claim of cumulative error, we must examine the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial." *United States v. Calderon*, 127 F.3d 1314, 1333 (11th Cir. 1997). Daniels has shown one error, which was Detective Hyatt's statement that Daniels was the robber

depicted in the surveillance videos.  But as explained above, that error does not rise to the level of plain error because it is not prejudicial.  "Where there is no error or only a single error, there can be no cumulative error."  *United States v. Gamory*, 635 F.3d 480, 497 (11th Cir. 2011).  We thus conclude that Daniels has failed to show cumulative error, and we affirm as to this issue.

## C.  Sufficiency of the Evidence

Next, Daniels challenges, on two grounds, the sufficiency of the evidence to support his conviction under Count 7 of the superseding indictment.  First, Daniels argues that no reasonable jury could find beyond a reasonable doubt that the robber in Count 7 threatened the victim with force or violence—a necessary condition for Hobbs Act robbery.  Second, he argues that no reasonable jury could find, beyond a reasonable doubt, that he committed the robbery alleged in Count 7.  For the following reasons, we reject both arguments.

### 1.  *Threat of Force or Violence*

The Hobbs Act criminalizes "robbery" that "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce."  18 U.S.C. § 1951(a).  The Act defines "robbery," in relevant part, as "the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or *threatened force*, or *violence*, or fear of injury, immediate or future, to his person or property, or property in his custody or possession."  *Id.* § 1951(b)(1) (emphases added).  Daniels argues that no reasonable jury would

find, beyond a reasonable doubt, that the robber in Count 7 employed "actual or threatened force, or violence, or fear of injury" to accomplish the robbery.

Daniels's argument fails in light of the surveillance video. Although the video is grainy, it is clear enough to allow the jury to conclude that the robber had a pistol in his hand. The surveillance video shows the muzzle of a black pistol extending over the robber's enclosed fist. And the video shows the silver coloring of the ejection port in the middle of the pistol's black slide. The firearm depicted in the surveillance video also resembles the firearm used in the other robberies. Furthermore, the video shows that the behavior of the 7-Eleven employee changed at the moment that the robber reached into his pocket and drew the firearm. Finally, the robber pointed the firearm at the employee and waived it around as if it were a gun.

Because of the surveillance video, a reasonable jury could find, beyond a reasonable doubt, that the robber employed "actual or threatened force, or violence, or fear of injury" to accomplish the robbery. § 1951(b)(1). The act of brandishing a firearm is sufficient, on its own, to threaten force or violence under § 1951(b)(1). *Cf. Parker v. United States*, 801 F.2d 1382, 1384 (D.C. Cir. 1986) (Scalia, J.) ("The act of threatening others with a gun is tantamount to saying that the gun is loaded and that the gun wielder will shoot unless his commands are obeyed." (quoting *United States v. Marshall*, 427 F.2d 434, 437 (2d Cir. 1970))).

### 2. *Identity of the Robber*

Next, Daniels argues that no reasonable jury could find, beyond a reasonable doubt, that Daniels was the individual who committed the robbery alleged in Count 7. Daniels emphasizes that the government never called an eyewitness to testify about the robbery. While this is true, significant evidence supports the jury's verdict, so a reasonable jury could find, beyond a reasonable doubt, that Daniels committed the robbery.

First, modus operandi evidence suggests that Daniels committed the robbery. As we summarized above, the government presented the following evidence showing that the robbery alleged in Count 7 closely resembled the nine other charged robberies. The robbery was committed during the same seven-day timeframe in October 2019 as the other robberies that were committed. Like the other nine robberies, the robber in Count 7 wore a brimmed hat, a long sleeve shirt, and pants. The robber was also wearing distinctive red boots, which were observed in five of the other robberies. The robbery occurred in the late afternoon or evening, just like all the other robberies. The robber targeted a 7-Eleven, which is the same chain that he targeted in five of the other robberies. The robber used a firearm that resembles the firearm depicted on the surveillance footage of the other robberies. Finally, the robber in Count 7 purchased a pack of Newport cigarettes from the 7-Eleven ten minutes before he robbed it. The robber also requested Newport cigarettes during five of the other robberies. Because of this strong modus operandi evidence, the jury could infer that Daniels

committed the robbery in Count 7 just as he committed the other nine robberies.  *See Pendergrass*, 995 F.3d at 876–77 (affirming a jury's verdict based on modus operandi evidence); *United States v. Bowers*, 811 F.3d 412, 425–30 (11th Cir. 2016) (same).

Second, surveillance footage shows that the robber in Count 7 carried a distinct red umbrella and wore red boots.  Police recovered red boots and a red umbrella when they searched Daniels's car.

Third, Daniels's cell-site data demonstrates that his phone was in the area of the robbery at least fifteen minutes before the robbery occurred.  *See United States v. Ransfer*, 749 F.3d 914, 933 (11th Cir. 2014) ("Based on the cell phone records and surveillance footage introduced at trial, a jury could find that Lowe was at the stores at the time of the robberies.").

Finally, the government presented evidence that someone used Daniels's phone to repeatedly search the internet for news about the robberies, including, specifically, a robbery at a 7-Eleven. The robbery alleged in Count 7 occurred on October 11, 2019, at a 7-Eleven in Miami Gardens.  On October 12 and 13, 2019, someone used Daniels's phone to search for "[r]obbery at gas station," "7-Eleven gas station robbery," "Miami robbery today," and "[g]as station robbery today."  On October 12, 13, and 15, someone also searched for "[g]as station robbery today," "MIAM 8 gas station robbery at gas station," "[r]obbery at gas station," and "[a]rmed robbery of gas station last night."

Based on this evidence, we conclude that a reasonable jury could convict Daniels for the robbery alleged in Count 7 of the superseding indictment. We therefore affirm as to this issue.

### D. Sentence

Finally, Daniels challenges the substantive reasonableness of his 180-month sentence. But Daniels advances only one argument: that the district court erred because it accounted for Daniels's conviction under Count 7 when crafting his sentence even though, according to Daniels, there was insufficient evidence to convict him under Count 7. Daniels's argument fails because it rests only on the assumption that there was insufficient evidence to convict him for the robbery alleged in Count 7. As explained above, that premise is incorrect.[2] Accordingly, we affirm Daniels's sentence.

### IV.    CONCLUSION

For all these reasons, we affirm Daniels's convictions and sentence.

**AFFIRMED.**

---

[2] At oral argument, Daniels conceded that if we reject his sufficiency-of-the-evidence challenge, then his sentencing challenge necessarily fails also.

22-10408                    JORDAN, J., Concurring                    1

JORDAN, Circuit Judge, Concurring:

Judge Lagoa's opinion for the court correctly applies our precedent, and I therefore concur in full. I write separately to urge the Eleventh Circuit Committee on Pattern Jury Instructions to revise the pattern instruction on identification to allow juries to consider, in appropriate cases, that the witness and the person identified are of different races.

Eyewitness testimony asks much of judges and jurors alike, and courts have long struggled to balance the probative value of such evidence against the inherent dangers of misidentification. The central question of whether and how to admit this type of evidence at trial necessarily implicates competing interests of justice. On the one hand, eyewitness testimony serves a key fact-finding function and may aid in determining guilt. On the other hand, inaccurate eyewitness testimony may just as easily skew the search for the truth.

Many have noted the perils of eyewitness testimony in criminal cases. For example, Justice Frankfurter, before he went on the Supreme Court, surmised the risk nearly a century ago with a single question: "What is the worth of identification testimony even when uncontradicted?" Felix Frankfurter, The Case of Sacco and Vanzetti 30 (Grosset & Dunlap 1962) [1927] (quoted in *United States v. Wade*, 388 U.S. 218, 228 (1967)). The Supreme Court reiterated that early warning in an opinion 40 years later when it vacated a conviction based on an uncounseled lineup and a subsequent in-court identification. *See Wade*, 388 U.S. at 228. Writing for the

majority, Justice Brennan stated that "[t]he vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification." *Id.* at 228. *See also Manson v. Brathwaite*, 432 U.S. 98, 119−20 (1977) (Marshall, J., dissenting) (emphasizing "the unusual threat to the truth-seeking process posed by the frequent untrustworthiness of eyewitness identification testimony").

By the end of the 20th century, some Justices on the Supreme Court had specifically identified cross-racial identifications as a potential source of wrongful convictions. Justice Blackmun, writing for himself and other dissenting Justices, highlighted the danger in a case where the prosecution's "only evidence . . . was the [eyewitness] testimony of the victim." *Arizona v. Youngblood*, 488 U.S. 51, 71−72 (1988) (Blackmun, J., dissenting). Arguing that the defendant was entitled to a "fair trial, not merely a good faith try at a fair trial," Justice Blackmun cautioned that "[c]ross-racial identifications [were] much less likely to be accurate than same race identifications." *Id.* at 61, 72 n.8 (citation and internal quotation marks omitted).

Empirical studies have largely confirmed these warnings— both as to eyewitness testimony generally and cross-racial identifications in particular. In the words of Justice Sotomayor:

> It would be one thing if the passage of time had cast doubt on . . . our precedents. But just the opposite has happened. A vast body of scientific literature has reinforced every concern our precedents articulated nearly half a century ago . . . . [M]ore than 2,000

> studies related to eyewitness identification have been published . . . . [T]he research . . . is not only extensive, but it represents the gold standard in terms of applicability of social science research to the law.

*Perry v. New Hampshire*, 565 U.S. 228, 262–63 (2012) (Sotomayor, J., dissenting) (citations and internal quotation marks omitted).  The "unreliability of eyewitness testimony is now widely recognized in the psychological literature and by law enforcement." *United States v. Owens*, 682 F.3d 1358, 1360 (11th Cir. 2012) (Barkett, J., dissenting from the denial of rehearing en banc).

Some studies conclude, among other things, that "eyewitness recollections are highly susceptible to distortion" and that "jurors routinely overestimate the accuracy of eyewitness identifications."  *Perry*, 565 U.S. at 264 (Sotomayor, J., dissenting) (citations omitted).  In fact, some have estimated that mistaken eyewitnesses may be responsible for roughly 80% of all wrongful convictions. *See e.g.*, Barry Scheck, et al., Actual Innocence: Five Days to Execution, and Other Dispatches from the Wrongly Convicted 73 (2000) (reporting that 84% of wrongful convictions were due, at least in part, to mistaken eyewitness identification).  *See also* Brandon L. Garrett, Convicting the Innocent: Where Criminal Prosecutions Go Wrong 48 (2011) (finding that eyewitnesses misidentified the suspect in 76% of the first 250 convictions overturned due to DNA evidence); Randolph N. Jonakait, The American Jury System 290 (2003) ("Because of their importance, eyewitness identifications have generated much study.  The research consistently confirms two key points.  First, many mistakes are made in eyewitness

identifications.  Second, jurors are not good at distinguishing incorrect identifications from correct ones.").

Other studies have significantly challenged the trustworthiness of cross-racial identifications.  "[T]he own-race bias is quite consistent . . . among both Black and White subjects."  Robert K. Bothwell et al., *Cross–Racial Identification*, 15 Personality & Soc. Psychol. Bull. 19, 23 (1989).  *See also* Christian A. Meissner & John A. Brigham, *Thirty Years of Investigating the Own–Race Bias in Memory for Faces: A Meta–Analytic Review*, 7 Psychol. Pub. Pol'y & L. 3, 18 (2001) (finding that "White participants demonstrated a significantly larger [own-race bias] when compared with Black participants").  Though experts continue to debate the root causes of the cross-racial effect, "researchers have endorsed the importance and reliability of the effect in several surveys . . . and attorneys have acknowledged the importance of racial interactions in eyewitness identifications."  *Id.* at 4.  One survey, for instance, reported that more than 90% of experts believe that "eyewitnesses find it relatively difficult to identify members of a race other than their own."  Saul M. Kassin, et al., *On the "General Acceptance" of Eyewitness Testimony Research: A New Survey of the Experts*, 56 Am. Psychol. 405, 410 (2001).

The current literature also highlights certain open questions.  For example, researchers "have long believed that exposure duration (e.g., time spent observing a perpetrator's face during a crime) is correlated with greater accuracy of eyewitness identification."  National Research Council, *Identifying the Culprit: Assessing*

22-10408                JORDAN, J., Concurring                    5

*Eyewitness Identification* 97 (2014).  The literature has confirmed that hypothesis—finding that "[l]onger exposures [are] associated with higher rates of correct identifications and lower false alarm rates." *Id*. at 98.  Yet for reasons that remain unclear to researchers, the same relationship between time and accuracy may not extend to cross-racial identifications.  *See* John C. Brigham et al., *The Influence of Race on Eyewitness Memory* in 2 Handbook of Eyewitness Psychology 261 (Rod C.L. Lindsey et al. eds., 2014) (discussing studies that found "longer encoding times generally produced a decrease in the magnitude of the [cross-racial effect]" and others that "failed to indicate a significant interaction").

Courts across the country have taken notice of the available research and sought to mitigate the risk of wrongful convictions in a number of ways, including allowing broad cross-examination, issuing revised jury instructions, and admitting expert testimony. *See, e.g.*, *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1124−25 (10th Cir. 2006) ("We explored the admissibility of expert testimony on the reliability of eyewitness identifications . . . . [S]killful cross-examination provides an equally, if not more, effective tool."); *Young v. Conway*, 698 F.3d 69, 79 (2d Cir. 2012) ("[D]istrict courts may property address the dangers of unreliable eyewitness identification testimony by giving a jury charge appropriate to the circumstances of the case.") (citations and internal quotation marks omitted); *Ferensic v. Birkett*, 501 F.3d 469, 482 (6th Cir. 2007) ("[E]xpert testimony on eyewitness identifications, once thought to be unreliable and overly prejudicial to the prosecution, is now universally recognized as scientifically valid and of 'aid [to] the trier of fact' for

admissibility purposes.") (citation omitted).  With varying degrees of success, each of these procedural safeguards recognizes the potential unreliability of cross-racial identifications and aims to place jurors on alert.  As one district court in this circuit put it:

> The potential inaccuracies of cross-racial identifications are not necessarily within the common knowledge of the average juror or, for that matter, the average judge . . . . If social-science research . . . aided this court's ability to understand the evidence . . . it would be curious to assume that the same research would be of no aid to the jury.

*United States v. Smith*, 621 F. Supp. 2d 1207, 1216−17 (M.D. Ala. 2009) (citations omitted).

Several courts have already revised their pattern instructions on eyewitness identification to permit juries to consider whether the witness and the person identified were of the same race.  *See, e.g.*, Pattern Criminal Jury Instructions for the District Courts of the First Circuit § 2.22 (updated December 21, 2018) ("You may consider the following in evaluating the accuracy of an eyewitness identification: risks of cross-racial identification . . . ."); Third Cir. Model Crim. Jury Instr. § 4.15 (revised February 2021) ("Many factors affect whether a witness has an adequate opportunity to observe the person committing the crime . . . includ[ing] . . . whether the witness and the person committing the crime were of different races . . . ."); Judicial Council of California Criminal Jury Instruction No. 315 (revised March 2022) ("In evaluating identification

22-10408                JORDAN, J., Concurring                7

testimony, consider [whether] . . . the witness and defendant are of different races.").  I submit it is time for us to do the same.

"The purpose of a specific jury instruction on cross-racial identification is to permit juries to consider the increased possibility of misidentification in determining whether or not there is sufficient evidence of guilt."  David E. Aaronson, *Cross-Racial Identification of Defendants in Criminal Cases: A Proposed Model Jury Instruction*, 23 Crim. Justice 4, 6 (ABA Spring 2008).  Nevertheless, I recognize that some courts have resisted this trend on grounds of insufficient research.  *See generally* Nathan R. Sobel, et al., On Fallibility of Interracial Identification, Eyewitness Identification: Legal & Practical Problems § 9:20 (2d. & 2023 update) ("The issue of interracial identification is highly controversial . . . despite the availability of studies concluding that interracial recognition is unreliable").

A recent Third Circuit task force consisting of "judges, lawyers, professors, and law enforcement agents" analyzed this divide in detail.  *See 2019 Report of the United States Court of Appeals for the Third Circuit on Eyewitness Identification*, 92 Temp. L. Rev. 1, 7 (2019).  The task force reiterated that there was "substantial agreement among eyewitness researchers that witnesses may be less accurate when identifying members of another race" and that "[m]any courts ha[d] noted the scientific agreement."  *Id.* at 83.  Only two members of the task force failed to join these findings in full, but even they agreed "that a cross-race effect may exist under certain circumstances."  *Id.* at 85.

In this case, the district court faced an important decision on whether to use our circuit's pattern instruction on eyewitness identification, grant the defendant's request to use the Third Circuit's model instruction, or do something in between. Among other differences, the Third Circuit's instruction asks jurors to consider "whether the witness and the person committing the crime were of different races." Third Cir. Model Crim. Jury Instr. § 4.15. At trial, the government argued against any such instruction:

> Your Honor, I don't think there is any need to bring race into this because I know counsel is referring to research that's been done. I haven't seen the research. I haven't read the research. I don't think we need to put in race . . . because it gives the insinuation that . . . people of different races may have difficulty identifying the other person . . . it gives the jury some reason to believe that race is a factor . . . .

D.E. 125 at 63. The district court disagreed with the government and instructed the jury that, in assessing the reliability and accuracy of the identification, it could consider whether "the witness and the person committing the crime [were] of different races[.]" D.E. 58 at 7.

I believe the district court made the right call, but I think we need to revise our pattern jury instructions to allow consideration of a possible cross-racial effect on identifications. Although pattern instructions are "not binding," *United States v. Dohan*, 508 F.3d 989, 994 (11th Cir. 2007), they are relied upon by the bench and bar, and are generally viewed as a type of safe harbor for what is

22-10408                    JORDAN, J., Concurring                    9

appropriate. Our patten instruction on identification has not been substantively updated since 1985, almost 40 years ago. *Compare* 11th Cir. Crim. Pattern Jury Instr. No. 3 (January 1985), *with* 11th Cir. Crim. Pattern Jury Instr. No. 3 (March 2022). It is time, in my view, for us to take account of the abundant literature on cross-racial identification and revise our instruction on eyewitness identification to permit juries to consider, in appropriate cases, that the witness and the person identified were of different races. I urge the Committee on Pattern Jury Instructions to make that change.